## IN ADMIRALTY.

R. C. JANION *vs.* THOMAS FOX, Master of the Bristish ship " Conrad."

Libellant brought a suit to recover possession of goods, which the defendant refused to deliver until he was paid the freight of a quantity of coal sold on the passage from England.

Held : that the court has jurisdiction, and may decree delivery of the specific property.

Defendant having sold a quantity of coals at Rio Janeiro, on the passage from Liverpool to Honolulu, the court held that he was not entitled to freight on the coals.

The facts necessary to the understanding of this case are briefly as follows:

In the month of May, 1854, the British ship Conrad was chartered for voyage from Liverpool to Honolulu, to carry a cargo of merchandise. She proceeded to take in her cargo, part of which consisted of 181 tons of coal, the freight of which, amounting to £1010 12s 6d, was to be paid, as by charter party, upon delivery " in the like good order and condition at the port of Honolulu, (all and every dangers and accidents of the seas and of navigation, of whatsoever nature and kind excepted,) unto Robert C. Janion or his assigns." " Having taken in the rest of her cargo, she set sail on the 21st of May, but she discovered on the 26th June that she had sprung a leak, and finding that the ship was making nine inches of water per hour, she stood away for the nearest port, and arrived at Rio Janeiro on the 13th July. The British Consul, on the application of the master, ordered a survey of the ship, and the surveyor reported that it was necessary to discharge cargo to get at the leak, which had been occasioned by the starting of a plank. Cargo was accordingly landed ; the vessel repaired; and the coal and a portion of the other cargo reshipped, when it was discovered that the coals which had been wet by the rain in discharging and reshipping, notwithstanding every pains was taken to keep them dry, began to heat. Thereupon, the captain called a survey on the coals, which were duly examined and the surveyors reported, that they had every reason to believe, that the coals would shortly take fire, and that they did not consider it prudent for the ship to proceed with the coals, in their present state, and therefore recommended that they be discharged and sold for the benefit of whom it might concern. The British Consul advised the sale of the coals, and the Captain acting on his advice and his own judgment, had them sold, after due notice, at public auction, thinking this the wisest course for all concerned It further appeared, from the evidence in the case, that though the coals if carried on in their wet state, would have been liable to spontaneous ignition, yet they might have been prepared for reshipment by drying, and safely carried to the port of destination. The principal witness on this point thought this process of drying would not consume more than four or five weeks, at the outside, and in fine weather might have been done in as many days. After the coals were sold, the Conrad took in the balance of her cargo, and again set sail on the 29th October, arriving at Honolulu on the 7th February, 1855. Upon her arrival, the mas-

ter declined to deliver the goods brought on, unless he was first paid the freight of the coals sold in Rio Janeiro. This the shipper refused to do, and brought this action to recover possession of his goods, with damages for their detention.

CHIEF JUSTICE LEE, after going over the facts of the case, delivered judgment as follows:

The first question arising in this matter is, that of the jurisdiction of this court. The libellant prays that the court will decree him possession of the cargo, and the learned counsel for the defendant contends that the court has no power or jurisdiction to make such a decree, but can only, in such cases, decree damages for the non-delivery if the master is in fault.

The contract upon which this suit is based is a maritime contract, and this action is in the nature of a libel *in rem* to recover the possession of certain goods, which libellant alleges the master of the Conrad has agreed to deliver. I am unable to perceive any sound distinction between this action and those brought to recover ships or other property to which a party is entitled by virtue of a maritime right, and which is wrongfully withheld from him. I am of the opinion, therefore, that the court has jurisdiction in cases like this, which is analogous to the action of replevin or detinue at the common law, in which the specific property is recovered instead of damages; and I think the doctrine not only consonant with reason, but with the authorities. (See Benedict's Admiralty, § 275, 276, and Appendix, p. 476.)

The usual practice is, I believe, to bring the suit in rem against the merchandise for possession, and cite the captain to appear and answer, but this is a matter of form that does not go to the merits of the action.

The next and most important question is, whether the captain is entitled to claim freight on the coals, in default of their delivery.

The general rule of maritime law is, that the goods must be delivered at the place of destination, according to the charter party or bill of lading, to entitle the owner of the vessel to demand freight. The conveyance and delivery of the cargo is a condition precedent, and must be fulfilled, and a partial conveyance does not meet the terms of the contract, and consequently gives the ship owner no claim for freight. (3 Kent's Commentaries, 219.) "The contract for the conveyance of merchandise," says Lord Tenterden in his valuable treatise on shipping, (2 Abb. Shipping, Eighth Eng. and Sixth Am. Ed., 406,) "is in its nature an entire contract, and unless it be completely performed by the delivery of the goods at the place of destination, the merchant will in general derive no benefit from the time and labor expended in a partial conveyance, and consequently be subject to no payment whatever, although the ship may have been hired by the month or week." (See also Holt on Shipping, p. 435.) That freight is not due, unless the voyage be performed, and the cargo delivered, and that partial performance is not sufficient, is a general rule too well established, and too generally known, to need the citation of any authorities in its support.

But to this general rule there are some exceptions, founded upon principles of equity and justice, as applicable to particular circum-

stances, and now let us see if this case is such a one as comes within the spirit or sense of any of these exceptions.

The doctrine is now firmly established, both upon principle and authority, that the merchant is bound to pay the ship-owner full freight, if the cargo is carried to the port of destination, notwithstanding at its arrival it is, by reason of sea damage, utterly ruined and worthless. If the ship-owner, or his agent the master, has conducted himself with fidelity and vigilance in the course of the voyage, he has no concern with the diminution of the value of the cargo. (Pothier, Charter Partie, No. 59; 3 Kent's Com., 225; Griswold vs. N. Y. Ins. Co., 3 Johns. Rep., 521; Jordan vs. Warren Ins. Co., 1 Story's Rep. 355.)

If casks contain wine, rum, or other liquids, or sugar, and the contents be washed out or wasted, and lost by the perils of the sea, so that the casks arrive empty, no freight is due for them; but the ship-owner would still be entitled to his freight; if the casks were well stowed, and their contents were lost by other causes than perils of the sea, such as internal decay, leakage, inherent waste, evaporation, or imperfection of the casks. (3 Kent's Com., 225; Frith vs. Barker, 2 John. 327.)

When a cargo consists of live stock, and some of the animals die in the course of the voyage, without any fault or negligence of the master or crew, and there be no express agreement, respecting the payment of freight, the general rule is, that freight is to be paid for all that were put on board. But if the agreement was to pay for the transportation of them, then no freight is due for those that die on the voyage, as the contract is not, in that case, performed. (Kent's Com., 226; Abb. on Shipping, 410.)

But this case obviously does not fall within either of the classes above specified. The goods have not arrived in a worthless state—they have not wasted by any inherent principle of decay. Still, there is another class of cases, where full freight is due, notwithstanding the goods have not arrived at the port of destination, and there are cases where a *pro rata* freight is due, notwithstanding the like non-arrival, and with these we have mainly to do in the investigation and settlement of this case.

"The whole of the cases," says Judge Story, "in which the full freight is, upon the ordinary principles of commercial law, due, notwithstanding the non-arrival of the goods at the port of destination, may be reduced to the single statement, that the non-arrival has been occasioned by no default or inability of the carrier ship, but has been occasioned by the default or waiver of the merchant-shipper. In the former case, the merchant-shipper cannot avail himself of his own default to escape from the payment of freight ; in the latter case he dispenses with the entire fulfillment of the original contract for his own interests and purposes. Thus, for example, if the goods be seized or detained at an intermediate port, for the illegal conduct, or wrongful act of the shipper, or if, at such intermediate port, he voluntarily insists upon receiving, and does receive his goods, the carrier ship being ready and able to carry them to their destination, there can be no doubt that full freight is due for the whole voyage." (Ship Nathaniel Hooper, 3 Sumner's R., 545.)

Let us consider, now, how these principles apply to the present

case. The non-arrival of the goods in this case has not been occasioned perhaps by any default of the carrier, but this is not sufficient to establish the claim for freight, for it remains to be shown that it has been occasioned by some default or waiver of the merchant shipper. The coals were discharged in Rio, and when the repairs to the vessel were completed, reshipped; when it was soon discovered that the coals, which were wet in being discharged and reshipped, notwithstanding every care was taken to prevent it, soon began to heat. Thereupon, the captain called a survey on the coals, and the surveyors reported that they were heated, and in their opinion would soon take fire; that it would not be prudent for the ship to proceed on her voyage in the present state of the coals; and recommended that they be discharged and sold for the benefit of whom it might concern. Acting upon this advice and that of the British Consul, the captain sold the coals, and hence their non-arrival. Here was no default on the part of the shipper, and none is pretended. He did not consent to receive his goods at the intermediate port of Rio, and have them sold on account of their damage and perishable nature, and therefore, did not grant any waiver of his rights under the contract. He was not on the spot in person or by his agent, and was not, and could not be consulted in relation to any action taken in the premises. There may have been no default on either side, but if there was, I cannot perceive any on the side of the shipper; and if there was none, and no waiver on his part, does the present case furnish any good ground to the claim for full freight ? When the cargo is so damaged as to be in danger of ignition, and, if carried on, will endanger the safety of the ship as well as the rest of the cargo and the lives of all on board, it would be contrary to common sense and common humanity to say that the master ought not in the exercise of a sound discretion to land and sell the same for the benefit of all concerned. It is a case of necessity, of unexpected and pressing calamity, arising in the course of the voyage, and what he fairly and reasonably does, under the circumstances, should bind all parties. Still, while a sale made under such an emergency, might furnish a valid defense perhaps, to a suit brought by the shipper for a non-delivery of the goods, it does not, I humbly conceive, afford a good foundation on which to base a claim for freight. (See Jordan *et al. vs.* Warren Insurance Company, 1 Story's R., 342 )

But there is still another view of this case to be taken. The coals though wet and heated, it appears could have been taken out of the vessel, dried, prepared for reshipment, and brought on in safety, and, as the owner was not present, and did not consent to the sale, it was the duty of the captain, perhaps, if he intended to claim freight, to have so dried and prepared the coals for reshipment. This would undoubtedly have retarded the voyage, but not for more than four or five weeks, and this temporary delay is not a sufficient excuse to justify a claim for freight in a case of sale. The master may have done the most prudent thing he could do, under all the circumstances of the case, and yet I do not see how he can fairly throw the loss of his freight upon the libellant.

Again, there is another ground, not raised by the learned counsel, which involves the claim for freight in some obscurity, and that is, the failure of the master to pay over or tender to the libellant the

proceeds realized from the sale of the coals. He has used those proceeds, amounting in round numbers to $1200, and without paying them over or offering to do so, he insists on being paid some five thousand dollars, the amount of full freight on said coals. It is not clear to me that this ground alone, would not go far to defeat the claim, but we prefer to decide the case upon broader ground, and being fully aware of the importance of establishing sound principles of commercial law in the infancy of our Admiralty Courts, I propose, at the risk of being tedious, to examine some of the most important cases bearing upon this subject.

The first case we will look at is that of Hunter vs. Prinsip, (10 East. 378.) Prinsep and others, owners of the ship Young Nicholas, chartered her to Hunter for a voyage from Falmouth to Honduras to fetch a cargo of mahogany and other wood from thence to London; and by the terms of the charter-party the freight was to be paid, one third upon a right and true delivery of the cargo, and the remaining two-thirds by an accepted bill or bills on the freighter, payable at three months' date from such delivery. The ship took in her cargo and sailed on her homeward voyage, but was so damaged in a storm as to be compelled to put into Savannah, in Georgia, to repair. Having been refitted she sailed again, but was taken, on her second day out of Savannah, by a French privateer, and subsequently retaken by a British sloop-of-war, and sent to St. Kitts, where she was driven on shore by a hurricane, and wrecked. The master, without the privity or consent of either party, applied to the Vice Admiralty Court at St. Kitts, for an order of sale for the wreck and cargo, he acting on that occasion according to the best of his judgment for the benefit of all parties concerned. The cargo was sold at public auction under order of the court, and the nett proceeds remitted to and received by the ship owners. Hunter, the freighter, then brought an action to recover the proceeds of the goods sold, and the ship owners insisted on retaining the whole thereof, on account of freight. The freighter, on the contrary, insisted that he was entitled to recover the proceeds of the goods sold, without any allowance for freight. The question for the opinion of the court was, whether any freight was due; and Lord Ellenborough, delivering the judgment of the court, said: "The principles which appear to govern the present action are these; the ship owners undertake that they will carry the goods to the place of destination unless prevented by the dangers of the seas or other casualties; and the freighter undertakes that if the goods be delivered at the place of their destination, he will pay the stipulated freight; but it was only in that event, viz: of their delivery at the place of destination, that he, the freighter, engages to pay anything. If the ship be disabled from completing her voyage, the ship owner may still entitle himself to the whole freight, by forwarding the goods by some other means to the place of destination ; but he has no right to any freight if they be not so forwarded, unless the forwarding of them be dispensed with, or unless there be some new bargain upon this subject." In the case of Hunter vs. Prinsep, it will be seen that the master, in the absence of the ship owner and freighter, acted under the order of the court, and did what he thought was best for the benefit of all concerned, yet the court refused any allowance for freight.

In the case of Liddard vs. Lopez, (10 East, 526,) the ship May-

flower was chartered by Lopez and another, merchants of London, to take a cargo of coals from Shields to Lisbon—freight payable at the rate of £20 per keel of coals, on the right delivery of the cargo. The ship took in cargo and sailed to Portsmouth, where she joined convoy, and sailed therewith to Lymington, where they were detained some time by contrary winds. At last the sailing instructions, which the master had received from the Commodore, were recalled, and the ship returned to Spithead, the ports of Portugal being shut against British ships by the Portuguese government. The cargo remained on board ship about four months, when the coals were landed and sold by consent of the parties, without prejudice on either side, and produced a clear profit of £166 18s. on the prime cost, after payment of all expenses. The master then sued the freighters, Lopez and another, for a compensation for the portion of the voyage performed, and for the detention of the ship. Luke vs. Lyde, (2 Bur. 882,) and other cases were cited in support of the master's claim, but Lord Ellenborough said, "The case of Luke vs. Lyde has been often pressed beyond its fair bearing, but the true sense of it has been explained by my brother Lawrence, in Cook vs. Jennings, (7 T. R. 381,) and my brother Le Blanc, in Mulloy vs. Barker, (5 East, 316.) Then what does this case amount to ? The parties have entered into a special contract, by which freight is made payable in one event only, that of a right delivery of the cargo according to the terms of the contract; and that event has not taken place. There has been no such delivery, and consequently the plaintiff is not entitled to recover. He should have provided in his contract for the emergency which has arisen."

The case of The Louisa, (1 Dodson R., 317,) holds the same doctrine. There, the ship and cargo, bound on a voyage from Quebec to the Island of Madeira, were captured on the 15th of December, 1812, by the American Privateer Decatur, and recaptured on the 15th of January, 1813, by the British ship Andromache. At the time of the recapture, the ship was in a distressed condition, with her main-top-mast and main-fore-mast gone. A prize-master was put on board with orders to proceed to the first port in England; but the ship having twenty-four inches of water in the hold, and the crew being exhausted, it was found impossible to reach an English port. The vessel was, therefore, taken into Corunna, where the cargo was disposed of, under the authority of the British vice-consul. On a suit for civil salvage in addition to military salvage for the recapture, a claim was made for freight, which was refused. Sir William Scott in his judgment says: "With respect to freight, I am of opinion, as well upon the equity of the case as upon the authority which has been cited, (Hunter vs. Prinsep, 10 East R., 378,) that none is due, the voyage having been totally defeated by the sale of the goods at Corunna."

The case of Mordy vs. Jones, (4 Barn. & Cress. 394,) coincides very nearly with the one under discussion, except that in that case the action for freight was brought against the underwriters, none having been claimed of the shipper. The ship Isabella sailed on a voyage from Kingston in Jamaica to Liverpool, having on board a cargo of cotton, coffee, sugar, hides, and other goods, shipped by various persons, with bills of lading in the usual terms. The ship having started a plank in violent weather, was obliged to put back to Kings-

town, when after a survey it was found necessary to land the whole of the cargo. This was therefore done, and the accident repaired, but part of the cargo had been so wetted by sea water, that it could not be reshipped without danger, from ignition, to the ship and the rest of the cargo, unless it underwent a process of washing, with fresh water, and then drying in the sun, which would have detained the vessel six weeks; and been attended with an expense equal to the freight. Under these circumstances, the shippers refusing to interfere, but approving of a sale by the master, the master sold the damaged goods, and sailed with the proceeds thereof to Liverpool, which, on his arrival, he paid over to the parties interested, without retaining the freight of the goods sold. The master's proceedings in Kingstown were found to be such as a prudent man, uninsured, would have adopted. The question was, whether, under these circumstances, the ship owner was entitled to recover freight for the goods sold, from the underwriters.

The court, Chief Justice Abbott delivering the opinion, held that he was not.

The American authorities on the question as to the right to the recovery of freight, where goods have been sold at an intermediate port, in cases of this kind, are decidedly against the doctrine that freight is due.

In the case of the Nathaniel Hooper, (3 Sumner R., 545,) the ship being at Havanah, took on board a cargo of sugars for St. Petersburgh, and in the course of her voyage struck on the south shoal of Nantucket Island, where she was abandoned by the master and crew, but afterwards floated off the shoal and went adrift to sea. The ship was subsequently picked up by the brig Olive Chamberlain and taken into Boston. A survey was made of her cargo and the surveyor having reported that a large part thereof was in a perishable condition, it was ordered by the admiralty court that all the damaged sugars should be sold, and they were accordingly sold by the Marshal of the District. A suit was brought for salvage, and the owners of the ship set up a claim for freight. Justice Story, in delivering his judgment, said: "In respect to the sugars which were damaged and brought in and sold on account of their perishable nature, they are not liable to pay any freight whatsoever. As to them, the entire voyage neither was, nor, in fact, could have been performed, but it was defeated by an overwhelming calamity, common to the whole adventure, which made the sale a sale from necessity, at an intermediate port    In such a case I consider it to be now well settled, that no freight whatever is due. There has been no voluntary acceptance of the damaged sugars at an intermediate port, dispensing with the further carriage of them, but an involuntary sale from necessity, to prevent them from there perishing by a total loss. There is no principle which would justify a *pro rata* freight under such circumstances." The doctrine here laid down is, in my opinion, strictly applicable to the case in hand.

Justice Washington, in the case of Hurton vs. Union Insurance Co. (1 Wash. C. C. R. 530,) cited in Abbott on Shipping, (6th Am. Ed. 455, n. 1,) holds the same doctrine. In that case the supercargo had from necessity sold the cargo at an intermediate port for the benefit of all concerned. The Court said :—" If the cargo is not con-

veyed to the place of its destination no freight can be demanded. If voluntarily accepted at any other port by the owner or his supercargo, freight *pro rata itineris* is due; but if it is received by compulsion, (as in this case it was held to be, under the circumstances) and the supercargo or captain is acting for the best for the benefit of all concerned, with a view to procure the property for the person entitled to receive the proceeds, no freight is due."

In the case of Saltus *vs.* The Ocean Insurance Co., (14 John. R., 138,) the ship Nancy, on a voyage from New York to Lisbon, having a cargo of rye flour and Indian corn, encountered a violent storm, and was obliged to put into Newport to repair. The cargo was found to be greatly deteriorated, and in a state not fit to be reshipped, and was accordingly sold. A portion of it had become putrid, and would not bear transportation. An action was brought to recover freight from the underwriters, and the court held that the ship owner could not recover on the policy, as the cargo, though damaged, still remained, *in specie*. (See also Mar. Ins. Co. *vs.* United Ins. Co. 9 Johns. R. 186 Caze *vs.* The Baltimore Ins. Co., 7 Cranch, R. 358. Griswold *vs.* New York Ins. Co., 3 Johnson's R. 321.)

A case more nearly in point, perhaps, than any yet cited, is that of Jordan *vs.* The Warren Ins. Co., (1 Story, C. C. R., 342) In this case, the ship Franklin took on board a cargo at New Orleans, on freight for Havre, consisting of cotton, tobacco, and other goods, and while proceeding on her voyage, being in tow of the steam boat Tiger, was driven by the violence of the waves and currents upon a bank in the River Mississippi, where the vessel remained hard and fast in the mud, and the ship was found to have considerable water in her hold, increasing from six to thirteen feet. The cargo was thereupon taken out and carried back to New Orleans; the ship, being lightened, was also carried back to New Orleans, and was repaired and fitted again for sea. After the cargo arrived at New Orleans, it was surveyed by experts, and being found wet and damaged, a large portion of it was, by their advice, sold at public auction. It appeared that the cotton, if reshipped in its wet and damaged state, would have been very liable to spontaneous ignition; but it could, by a process of drying, sorting and repacking, be put in a state for reshipment. But the process was slow and would occupy a considerable length of time to be perfected, as long, some of the witnesses thought, as six months. But it did not appear, that the cotton might not have been dried, so as to have been safe for transportation, against ignition, in a shorter period. An action was brought against the underwriters to recover freight, and Mr. Justice Story held, that the underwriters were not liable. In the course of his opinion, he intimates that the shippers of the cargo would be liable for freight, but it was on the express ground, that the shippers had consented to receive the damaged goods, and that there was a mutual voluntary agreement on the part of the master and the shippers that the damaged cargo should be sold. This case is well worthy of an attentive perusal.

Upon the whole, then, after mature deliberation, both upon principle and authority, I am of the opinion that there is no good claim for freight for the goods sold at Rio, and that the libellant is entitled to the possession of the goods which have arrived, and upon which

U

freight was to be paid in England one month after the sailing of the vessel.

In relation to the damages claimed for detention of the goods which have arrived, I am of the opinion, considering the agreement of the parties, by which the goods were delivered the day after the commencement of this suit, and other circumstances of the case which it is unnecessary to relate, that none should be granted; though, as a general rule, the master would be liable in damages in such cases.

Let decree be entered for libellant, with costs.

Mr. Bates and Mr. Montgomery proctors for libellant.

Mr. Blair, proctor for defendant,

## IN ADMIRALTY.