## IN ADMIRALTY.—SEPTEMBER, 1855.

## KAUI AND NIHEU *vs.* SCHOONER "WILHELMINE."

The court in "a cause of possession" will adjudicate upon the real and equitable ownership of a vessel, and is not restricted in its jurisdiction to an adjudication upon the bare legal title, resting upon the registry.

JUDGE ROBERTSON, acting as Chief Justice, pronounced judgment as follows.

This is a suit brought to recover possession of the Hawaiian schooner "Wilhelmine."

The libellants, in their petition, claim to be the owners of seventeen twentieth parts of the said vessel, which is of about 156 tons burthen, and now lying in the port of Honolulu; and they claim that as such owners they are entitled to the full possession of the vessel. They set forth that in the month of November last, they placed in the hands of Kahoukapu, the sum of seventeen hundred dollars, in unequal proportions, viz : Kaui one thousand dollars, and Niheu seven hundred dollars, to be laid out in the purchase, for them, of the said vessel; that Kahoukapu did purchase the vessel, at some time in the month of November, from Washington T. Walker, with the money of the libellants, the bill of sale being made conveying the vessel to Kahoukapu, in his own name; that since that time Kahoukapu has repeatedly stated that the libellants were the true owners of the vessel, that, up to within a short time previous to the commencement of this

suit, the libellants have controlled the vessel, received her earnings, and appointed the master, and that for a short time past Kahoukapu has wrongfully withheld the possession of the vessel from the libellants, upon an alleged title in himself.

The respondent, Kahoukapu, in his answer, traverses nearly all the material allegations of the libel, and alleges that he bought the vessel from Washington T. Walker, on the 13th of November last, paying for her the sum of $2,000, and that on the 4th day of September, instant, he being then in possession of the vessel, sold her to J. W. H. Kauwahi.

J. W. H. Kauwahi intervenes for his interest, and claims to be the lawful owner of the vessel, under a bill of sale from Kahoukapu, dated on the 4th of September instant, alleging that he purchased said vessel in good faith, having no knowledge of any adverse claim, and paid for her the sum of fifteen hundred dollars.

The testimony adduced in the cause is rather voluminous, too much so, indeed, to be recapitulated at length. We have perused it attentively, and considered it with great care, and we are of opinion that the libellants have proved, beyond any reasonable doubt, that soon after their return from California, in company with the respondent, they placed in his hands the sum of seventeen hundred dollars, in the proportions set forth in their libel, in the early part of November last, for the purpose of investment in a vessel; that, in pursuance of that object, Kahoukapu did, shortly thereafter, purchase the vessel in dispute, from Washington T. Walker, who conveyed her, by bill of sale, to Kahoukapu, in his own name, the libellants being at that time absent from Honolulu, at the island of Maui, and that Kahoukapu then procured the register to be transferred at the custom house, into his own name.

As was truly observed by our learned brother, CHIEF JUSTICE LEE, in the case of G. B. Post *vs.* the Schooner Lady Jane, " a vessel may be, and often is, registered in the name of a person who has not a farthing's interest in her, while the equitable title and real ownership is in another person." Such, we apprehend, is nearly, if not entirely, the truth of the matter in the case now before us.

The learned counsel for the respondent and claimant contends that, even admitting the libellants have proved that they were the owners of seventeen hundred dollars of the money paid by Kahoukapu for the vessel, the transfer by bill of sale having been made to him, in his own name alone, together with the endorsement on the vessel's register, the libellants, as *cestuis que trust*, would only have an equitable interest in the vessel, which cannot be enforced in this court, as a court of admiralty, although they might be able at law to compel Kahoukapu to account to them for the proceeds of the vessel. He takes the ground that, as a court of admiralty, we cannot look behind the bare legal title, which in this case was undoubtedly in the respondent.

We are aware that this doctrine was, for a great length of time, recognized and acted upon in the English High Court of Admiralty, during a period when that tribunal was ousted of a great portion of its ancient and legitimate jurisdiction, through the jealousy and overbearing of the common law courts, but we doubt if such be the case at the present time, for by the enactment of the 3 and 4 Victoria, chap. 65, it is wisely provided, " That the said Court of Admiralty

shall have jurisdiction to decide all questions as to the title to or ownership of any ship or vessel, or the proceeds thereof remaining in the registry, arising in any cause of possession, salvage, damage, wages, or bottomry, which shall be instituted in the said court after the passing of this act."

"This enactment," says Judge Conkling in his valuable Treatise, at page 266, "it is presumed, was designed virtually to abolish the distinction between possessory and petitory actions, and to empower the court to entertain jurisdiction, under the form of a "cause of possession," of all suits instituted by the rightful owner or persons claiming to be such, for the purpose of obtaining possession of a ship alleged to be unlawfully withheld from him, whatever might be the nature of the defence set up to the action."

It may be, that notwithstanding the passage of the act referred to above, the English court of admiralty considers itself "bound down to decide on the legal title without taking notice of equitable claims," (per Lord Stowell, in The Sisters, 5 Robinson's Rep.) as would seem to be the natural inference from the language held by Dr. Lushington, in the case of The Valiant, 1 W. Robinson's Rep., page 64, if that case, as is evidently supposed by Judge Conkling, was adjudicated subsequently to the passage of the 3 and 4 Victoria, Chap. 65; but this, we think, is clearly not so, because the case is reported as having been decided on the 16th of July, 1839, and the act referred to, as given in the Appendix to 3 Haggard's Rep., bears date the 7th day of August, 1840, more than a year later.

We regret that we have not at hand the means of knowing precisely how the practice of the High Court of Admiralty has been modified in respect to the subject under consideration, by the passage of the 3 and 4 Victoria, chap. 65. But we believe that, in ascertaining the true boundaries of the jurisdiction of courts of admiralty, the courts of the United States, particularly in the opinions and decisions of the late Justice Story, who so ably vindicated and upheld the admiralty jurisdiction in its fullest extent, will furnish us with a safer guide than the English High Court of Admiralty, inasmuch as the former exceedingly strict limitation of the powers of that court, was a clear infraction of its ancient rights and confined entirely to itself, not having extended even to the court of admiralty in Scotland, which, while the former was laboring under the embarrassments already alluded to, always claimed and exercised a very extensive and beneficial jurisdiction.

In the case of the Schooner Tilton, (5 Mason's Rep. p. 465,) Judge Story, after referring to the early and very learned exposition on this subject made by him, in the case of De Lovio *vs.* Boit *et al.*, (2 Gallison's Rep., p. 398,) and showing by several English authorities of undoubted respectability, that the admiralty anciently exercised jurisdiction in petitory as well as possessory suits, goes on to say, "I am not aware that this distinction between petitory and possessory suits (somewhat analogous to the distinction in actions respecting the realty between droitural and possessory suits) has in point of jurisdiction, ever been admitted into the actual practice of the courts of the United States, sitting in admiralty. It stands, as far as I have been able to trace it, upon no principle, unless it be that titles to property derived from the common law, shall be no where litigated except in the courts

of common law, a proposition that, carried to its full extent, would prostrate the entire jurisdiction of the admiralty in instance causes. Indeed, the titles to ships principally depend upon the maritime law, as recognized and enforced in the common law; and the admiralty does little more in instance causes, than to carry into effect the declarations of the maritime law, so recognized and enforced. No doubt exists, that the admiralty possesses authority to decree restitution of ships wrongfully withheld from the owners. And if so, it ought to possess plenary jurisdiction over all the incidents." The reasoning of this eminent jurist is perfectly conclusive to our mind, and we adopt it, in reference to the subject we are now considering, in its fullest extent, as his able opinions on some other points have been heretofore, from time to time, received and laid down by this court as its guide.

But the counsel for the claimant contends further, that he is a *bona fide* purchaser of the vessel, from the party in whom was the legal title, at the time of the sale, without knowledge or notice of any right or claim on the part of the libellants, and that whatever may be the real state of the case, as between them and Kahoukapu, it cannot affect the claimant's rights as an innocent third party.

As a legal proposition, we think the argument of the learned counsel is clearly right; but, after a careful review of all the evidence and surrounding circumstances bearing upon this part of the case, we feel constrained to say that we do not believe that the claimant's position is true, in point of fact. It is in evidence before us that Kaui, one of the libellants, since his return from Maui, has openly, continuously, and undisputedly, controlled and exercised rights of ownership over the vessel and her earnings. This is conclusively proven by the uncontradicted testimony of Mr. Piikoi, Captain Antonio, and Keliikanakaole who kept the accounts of the vessel. It appears also that the vessel has been known among the natives generally as the vessel of the " poe Kalifonia," meaning the natives returned from California, and we do not believe that a native of the claimant's acuteness was ignorant of the fact that the vessel had several owners. The bill of sale of the vessel, from Kahoukapu to his friend and relative, the claimant, is upon its face a suspicious looking document. It is all in the handwriting of the claimant, including the signatures of Kahoukapu, the grantor, and of Milikaa, one of the witnesses, who are purported to have made their marks. True, it is also signed by S. Kaapuiki, as a witness, but he testified before us that he subscribed his name on it at the claimant's request, and did not see the instrument executed.

The claimant introduced three witnesses, viz: Milikaa, Kaapuiki and Kanakaole, to prove the execution of the bill of sale by Kahoukapu and his receipt of the consideration from the claimant. From the demeanor of the first named witness; from his contradictory statements; from the direct conflict of his testimony with that of the claimant's other witnesses who are more credible than himself, and from the subsequent avowal of the claimant's counsel as to the untruth of some of his statements, we are strongly inclined to believe that the testimony of Milikaa is a tissue of falsehood, from beginning to end. We must at all events regard it as altogether unworthy of credit. Neither of the other two witnesses prove directly either the execution

of the bill of sale or the payment of the money, but the last one, Kanakaole, does testify that he brought $1,500, in silver money, from the house of Mr. Haalelea to that of the claimant, on the day of the date of the bill of sale, and that Kahoukapu was there at the time. We do not consider the fact as to the payment of the money, however, a very important one, because, be that as it may, we feel convinced beyond a doubt that the claimant was well aware of the fact that Kaui and Niheu were owners, in part, of the vessel, and that with full knowledge of that fact, he was guilty of colluding with Kahoukapu for the purpose of attempting to defraud the libellants of their just rights.

We are satisfied that the libellants are the true owners of seventeen twentieths of the vessel, as set forth in their petition, and that the sale from Kahoukapu to the claimant, as far as the libellants are concerned, is a fraud and a nullity.

Some evidence has been given tending to show that the remaining three twentieths of the vessel belong either to Milikaa, or to Milikaa and Kahoukapu severally, but Milikaa's own testimony would seem to negative any interest on his part. However, we are not called on to decide this point at present. If, as we firmly believe is the case, these two parties have joined in a scheme to defraud their co-owners, and the former should, in doing so, have lost their own shares, they may set that down to the account of their own cupidity.

Let decree be entered in favor of the libellants for the possession of the vessel, and let the costs be borne in equal proportions by Kahoukapu and the claimant.

Mr. Blair and Mr. Marsh, for the libellants.

Mr. Bates, for respondents.

NOTE.—See Post *vs.* Schooner "Lady Jane," March, 1855.