THE PEOPLE, BY F. M. PIXLEY, ATTORNEY–GENERAL, *ex rel.* HENRY F. TESCHEMACHER *v.* BENJAMIN DAVIDSON, JULIUS MAY, J. R. CORYELL, THOS. BELL, PETER DONAHUE, AND JOSEPH DONAHUE, EXECUTORS OF THE LAST WILL OF JAMES DONAHUE, DECEASED.

| 30 | 379 |
| 91 | 220 |
| 30 | 379 |
| 101 | 335 |
| 30 | 379 |
| 116 | 402 |
| 30 | 379 |
| 139 | 477 |
| 30 | 379 |
| 140 | 6 |

A WHARF NOT A NUISANCE AS A LEGAL CONCLUSION.—It does not follow as a legal conclusion that a wharf erected below high water mark in tide waters and upon the soil thereunder belonging to the State, is a public nuisance, or an injury to commerce and navigation. Whether such wharf is a public nuisance is a question of fact.

INJUNCTION RESTRAINING ERECTION OF A WHARF.—When the Court is satisfied that a wharf erected in tide waters and upon the soil thereunder belonging to the State, is not a public nuisance, an injunction should be refused, or dissolved if one has been temporarily granted.

MEANING OF WORDS "TIDE LANDS."—The words "tide lands," as used in the Act of May 14th, 1861, entitled "An Act to provide for the sale of marsh and tide lands of this State," mean such lands only as are covered and uncovered by the tide, and does not include lands permanently submerged.

SALE OF LANDS BELOW LOW WATER MARK BY THE STATE.—The Act of May 14th, 1861, entitled "An Act to provide for the sale of marsh and tide lands of this State," does not confirm Alcaldes' grants to or sales of lands lying below low water mark, and permanently submerged.

POWER OF COURTS OF EQUITY TO ENJOIN ERECTION OF WHARVES. — The District
　　Courts, as Courts of equity, have no power to decree the destruction or to enjoin a
　　purpresture caused by the erection of a wharf in tide waters and upon the soil
　　thereunder belonging to the State, without a license from the State, unless it is or
　　will be a public nuisance, or is or will be followed by some form of irreparable
　　damage, or unless it is or will be a hindrance to the execution of some legis-
　　lative Act relating to fishery, or to commerce or navigation.

EQUITY JURISDICTION OF DISTRICT COURTS.—The equity jurisdiction with which our
　　District Courts are invested under the Constitution, is that administered in the
　　High Courts of Chancery in England.

WHARVES ERECTED IN TIDE WATERS AND ON SOIL BELONGING TO THE STATE.—If a
　　wharf is erected in tide waters and upon soil belonging to the State, without a
　　license from the State, it will belong to the State, and possession of the land and
　　wharf, if withheld, can be recovered in ejectment by the State.

APPEAL from the District Court, Fourth Judicial District,
City and County of San Francisco.

On the 19th day of July, 1848, T. M. Leavenworth, Alcalde
of San Francisco, granted to M. L. Callendar a one hundred
vara lot, and on the 4th day of September thereafter granted
to William S. Clark another lot, fifty by one hundred varas,
both of which constitute a block of land covered by water,
and situate outside of the water front of San Francisco estab-
lished by an Act entitled "An Act to provide for the disposition
of certain property of the State of California," passed March
26th, 1851. On the 9th day of July, 1861, defendant Coryell
became the owner of said Alcalde grants, and after the passage
of the Act of May 14th, 1861, entitled "An Act to provide
for the sale of the marsh and tide lands of this State," the
other defendants purchased the same from said Coryell. The
defendants, other than Coryell, claimed to own the said lots
by virtue of said Act, as a confirmation of the grants, and
were proceeding to erect a wharf on the same when the
Attorney-General commenced this action.

After the dismissal of the action the Court granted a new
trial, and the defendants appealed from the order granting a
new trial.

The other facts are stated in the opinion of the Court.

*H. & C. McAllister*, and *J. P. Hoge*, for Appellants, argued
that the Act of May 14th, 1861, confirming the Alcalde grants,

upon which the wharf was erected, operated as a distinct grant from the State, as it ratified and confirmed Alcalde grants of either marsh or tide lands in and about San Francisco. They contended that the words "tide lands" denoted lands between high and low water mark, and also lands reclaimable from tide water, and that the Legislature had given a definition to the words "tide lands" in the thirtieth section of the Act of April 27th, 1863, in which they had declared that the Act should not apply to "tide lands" upon the city front and within five miles of San Francisco, thus emphatically designating the lands upon the city front of San Francisco as "tide lands;" that the word "tide," in the statutes of common law countries, signified not the highest tides of the year, nor even the spring tides of the month, but the ordinary tidal flux, and cited Lord Hale's *De Jure Maris,* pp. 12, 26; *Blundell* v. *Caterall,* 5 Barn. and Ald. 268. Upon the question of the Act of May 14th, 1861, being a direct legislative grant, they cited *Field* v. *Seabury,* 18 How. U. S. 322; *Chapin* v. *Bourne,* 8 Cal. 295; and *Oakland* v. *Carpentier,* 21 Cal. 642.

*William Hale,* for Respondents, argued that under the Spanish and Mexican laws, grants of pueblos on the borders of the ocean or any of its bays, did not extend into the water, and cited *Hart* v. *Burnett,* 15 Cal. 542; *Payne* v. *Dewey and Treadwell,* 16 Cal. 230; and *The City of San Francisco* v. *United States,* decided in the District Court of the United States for the Northern District of California, in May, 1865, and that the Alcalde, therefore, had no jurisdiction to make the grants in question, and that, therefore, if the Act of 1861 was inoperative as a conveyance, the defendants were without title. He contended that the exception in the Act of 1861, ratifying and confirming Alcalde grants, must be considered as referring to pueblos, as there were no Alcalde grants outside of pueblos; and as pueblos did not extend into the water, it was evident that the Alcalde grants ratified and confirmed were those above low tide and not below it, and cited *People* v. *Morrill,* 26 Cal. 336. He also contended that if the Legislature had intended,

under the general description contained in the Act of 1861, to include property over which Alcaldes had never exercised any jurisdiction, they would have described it appropriately.

*J. G. McCullough, Attorney-General,* also for Respondents, argued that driving piles to build a wharf where the water was eighteen feet deep at low water, would impede steamers and vessels, and thus obstruct free navigation of a harbor, and would be a nuisance at common law, and cited *Hart* v. *Mayor, etc., of Albany,* 9 Wend. 571. He contended that even if defendants owned the land under the water, they could not take possession of the water above and fill it with piles, and by that means destroy navigation; but that they did not own the soil, because the Act of 1861 only confirmed such Alcalde grants as were located upon tide and marsh lands, and that land below low water mark was not tide land or marsh land, because if land perpetually covered with water was " tide land," the whole Bay of San Francisco would become " tide land."

*J. P. Hoge,* for Appellants, in reply, contended that Alcalde grants were often made of tide lands, amd that said grants were numerous and covered large portions of the land covered by the deep waters of the bay, and were still held and owned under such grants and the confirmatory Act of 1851. He also argued that the Alcalde grants in question, of land covered by water, were intended to be specifically confirmed by the Act of May 14th, 1861, and that the argument of appellant's counsel, instead of construing or attempting to construe the exception in the Act of 1861 confirming Alcalde grants, would strike the exception from the Act; and that the State owned all the land under the waters of the bay, and the Legislature used the words " tide lands " in a genuine sense, and intended to include lands covered by tide water.

By the Court, Shafter, J.:

This is a bill to restrain the defendants from erecting a wharf from the north line of Chestnut street, in the City of San Francisco, toward and into the deep waters of the bay. It is alleged that the wharf, should it be erected, will greatly interfere with and hinder the trade and commerce of the State at the harbor of said city, and greatly diminish its value; wherefore the plaintiffs pray that the erection of the wharf may be enjoined.

The Court has found, among other things, that the defendants were engaged at the commencement of the action in constructing a wharf at the point mentioned, but has also found " that said wharf, so being built and proposed to be built by defendants, was not and would not be a nuisance, and was not injuring and would not injure the harbor of San Francisco, or the shipping or commercial interests thereof, or the people of the State of California." On the findings the Court below dismissed the action.

First—We cannot go behind the findings, for the testimony is not before us; and the only question for us to consider is, whether, assuming the findings, the judgment is to be regarded as erroneous.

The gist of the action in one aspect of the case is a threatened injury to commerce and navigation resulting or to result from the erection of a wharf in a public harbor. The wharf may be an intrusion or encroachment upon tide waters or the soil thereunder belonging to the State, but the encroachment would not therefore be a public nuisance nor an injury to the harbor by legal conclusion. Lord Hale says (*De Jure Maris*, 11): "It is not every building below the high water mark that is *ipso facto*, in law, a nuisance. For that would destroy all the keys that are in all the ports of England, for they are all built below the high water mark." All the authorities concur in holding that whether any given encroachment upon a public or private right is a nuisance or not, is a question of fact, and there have been at least two decisions to that effect

in this State. (*Gunter* v. *Geary*, 1 Cal. 466 ; *Middleton* v. *Franklin*, 3 Cal. 241.) Where the Court is satisfied that the encroachment or other matter complained of is not a nuisance, an injunction is necessarily refused, or dissolved if one has temporarily been granted. (2 Eden. on Inj. 272.)

Second—The complaint, in addition to the aspect under which we have thus far considered it, was doubtless intended also as a bill to enjoin or abate a purpresture—that is, an intrusion or encroachment upon tide waters and the soil thereunder—without any reference to the effect of the encroachment upon public interests whether to injure or promote them.

Assuming the complaint to bear the double aspect of a bill to abate a nuisance and, as distinct therefrom, to enjoin or abate a mere purpresture, two questions are presented for consideration : First, does the block in question belong to the appellants ; and second, if it belongs to the State, as alleged in the complaint, can the further erection of the wharf be enjoined, and can it be abated in equity in so far as it has been proceeded with.

It is not only admitted but claimed by the appellants that the land belonged originally to the State, and that the title passed to those under whom the appellants claim, by legislative grant made on the 14th of May, 1861. (Acts 1861, p. 363.) The Act is entitled "An Act to provide for the sale of marsh and tide lands of this State." The first section confirms all sales of such lands previously made, and provides for further purchases, outside of certain localities mentioned, and then proceeds as follows : " Provided further, that no sales of lands, either tide or marsh, excepting Alcalde grants, which are hereby ratified and confirmed, within five miles of said cities (San Francisco and Oakland,) or within one mile and one half of the State Prison grounds aforesaid, shall be confirmed by this Act."

It is admitted that the block described in the complaint was covered by Alcalde grants made in the year 1848, and that those grants conveyed no title to the grantees.

The subject matter of the Act is " marsh and tide lands:"

The sales which the Act confirms, and the sales which it authorizes thereafter, as well as the sales which it inhibits, are of lands falling within this general description; and as we know of no principle upon which we can extend the subject matter beyond the limits expressly put upon it both by the title and the provisions òf the Act, we consider that the grants intended to be confirmed were Alcalde grants of marsh and tide lands, to the exclusion óf all others.

That portion of the block upon which the defendants were engaged in driving piles at the commencement of the action was below the line of low water, but as to whether the balance of the lot was permanently submerged at the date of the Act the findings are so far in conflict with each other that we are unable to determine. However the fact may be, it is admitted that the lands lying below the line of low water cannot be regarded as "marsh," nor do we consider that they can be regarded as "tide lands" in the sense in which those words are used in the Act of 1861.

The phrase "tide lands," considered as a term of description, is unknown, so far as we are advised, in the law of tide waters; and it is certain that they were put to use for the first time in the legislation of this State in the Act of May 13, 1861. Prior to. that time the lands offered for sale by the State, having any connection with the present question, were described as "swamp and overflowed." In the Act of the 13th of May, 1861, the lands to which it relates are described as "swamp and overflowed, and salt marsh and tide lands donated to the State by Act of Congress." There is not only no definition given of the new terms introduced, but the question of their meaning is still further embarrassed by the circumstance that no lands had then been donated to this State by Congress which can be considered as tide lands in any sense; nor has any such donation been made since. In the Act of the 14th of May, 1861, passed the day after the Act last mentioned, the word "marsh" is not qualified by the word "salt," and in various Acts that have been passed since that date the

general subject has been still further embarrassed by invention. We have now to deal not only with "swamp and overflowed," "tide lands," "marsh lands" and "salt marsh," but with lands that are simply "overflowed," "tidal lands," "submerged lands," "overflowed and submerged" and "mud flats." (Acts 1862, pp. 208, 297, 474; Acts 1863, pp. 487, 499, 768; Acts 1864, pp. 355, 463.)

We find nothing in the Act of May 14th, 1861, affording the slightest clue to the sense in which the Legislature use the words "tide lands" therein, and the Act of the day previous, in which the phrase was introduced for the first time, is equally barren of suggestion. Under such circumstances, that definition must be adopted which on the whole is most reasonable, and that is supplied, in our judgment, by the word "strand," "beach" or "shore," in the common law sense of the terms.

Lands below the line of low water are usually spoken of as such, or as the bottom of the sea, or gulf, or bay, or as lands lying in deep water, or as water lots. Further, "tide" is obviously used in the Act as a term of distinction; but lands permanently submerged are distinguished for no purpose either useful or real by calling them tide lands. While it is claimed that the words are applicable to lands below the line of low water, it is admitted by counsel that they include also lands lying above it; the words, as thus defined, do not present or go upon the real distinction between the two classes of lands, and they are therefore valueless for the purpose of legal or scientific classification or arrangement. Further, if the words are applied to lands below the low water line, then they would not stop at the channel, but would reach to the opposite shore.

As opposed to all this, if the phrase is applied to the "shore" only, the word "tide" notes an important physical change to which the "lands" with which it is coupled are periodically subjected. As thus interpreted, the paraphrase would be "lands which are covered and uncovered by the tide."

On the ground, then, that the larger meaning ascribed to the words overlooks a real and governing difference, and generally on the ground that the definition would be entirely valueless for the purposes of arrangement, while the more restricted definition presents the difference named, and therein subserves the very purpose to which all definition is appointed, we consider it more reasonable to hold that the Legislature used the words in question as applicable to lands lying upon or constituting the "shore" rather than as including them, together with other lands differing specifically from them and extending indefinitely beyond them into deep water.

The result is that the block, in so far as it lies below the line of low water, belongs to the State; and the wharf, in so far as it has been built, is a purpresture. We shall now proceed to the second branch of the inquiry.

The District Courts have no power as Courts of equity to decree the destruction of a naked purpresture, nor to restrain one if threatened. The intrusion, whether perfected or threatened, is not distinguishable, so far as the question of equitable cognizance is concerned, from intrusions upon uplands belonging to the public or to individuals. In all such cases, parties are left to their strictly legal remedies, unless they can make out a case of damage irreparable at law.

Though it is now settled that a Court of equity may take jurisdiction in cases of public nuisance by an information filed by the Attorney-General, the jurisdiction seems to have been acted on with great hesitancy and caution. Thus it is said by Lord Eldon "that instances of the interposition of a Court of equity in England in such cases are confined and rare; and more information on the subject is to be collected from what has been done in the Court of Exchequer upon discussions of the right of the Attorney-General, by some species of information, to seek on the equitable side of that Court relief as to nuisance, than from any other quarter." (*Attorney-General* v. *Cleaver*, 18 Ves. R. 216.) Chancellor Kent, in *Attorney-General* v. *Utica Insurance Company*, 2 J. Ch. 382, remarks: " that the equity jurisdiction in cases of public nuisance, in

the only cases in which it had been exercised—that is, in cases of encroachment on the King's soil—had lain dormant for a century and a half—that is, from Charles I down to 1795. But the jurisdiction has been sustained, upon the principle that equity can give more adequate and complete relief than can be obtained at law. Whilst, therefore, it is admitted by all that it is one of delicacy, and, accordingly, the instances of its exercise are rare, yet it may be exercised in those cases in which there is imminent danger of irreparable mischief before the tardiness of the law could reach it."

It was held in *Rowe* v. *Granite Bridge Company*, 21 Pick. 344, that "where it is obviously necessary that a nuisance should be immediately suppressed, as in case of a podwer house or a slaughter house, or a chemical laboratory, equity will interfere until the slower process by indictment could be put in motion."

A bill or information was filed in the Court of Chancery in New Jersey by the Attorney-General, in the name of the State, charging the defendants with being in the act of erecting a bridge over the Passaic River, which is a navigable stream, in such a way as to interfere materially with the navigation; and it called upon the Court, on the ground that the bridge would be a serious detriment to the community and a public nuisance, to interfere and prevent the further erection of the same, and also to order the same to be abated. The information charged that great mischief and irreparable injury would ensue to the public by the erection of the bridge. But the application for an injunction was denied, on the ground that a Court of equity ought not to interfere in a case of misdemeanor when the object sought can be as well attained in the ordinary tribunals; and, under the facts as made out, the Court considered that the proper course was by indictment at common law. (*Attorney-General* v. *N. J. R. and Trans. Co.* 2 Green Ch. R. 136.)

Courts of equity have no criminal jurisdiction, and public nuisances are misdemeanors. This accounts for the peculiar disinclination to which the foregoing authorities refer, while

the cases, in their turn, fix the instances in which the disinclination has been resisted and overcome.

The clear result is that if a wharf built, or threatened to be built, upon tide lands, or below the line of low water, without public authority, is or would be injurious to commerce and navigation, and proceedings at law would not be adequate to the emergency, the erection may be abated or enjoined in equity; but where the wharf is not, or would not be attended with any such result, the equitable jurisdiction fails, and the people are left to their legal remedies. If the soil in this case belongs to the State—and such is the theory of the bill—then the wharf, if erected, will belong to it also. The defendants will be unable to collect wharfage, and will have no rights except those belonging to the public at large. Possession of the land and wharf, should it be withheld, can be recovered in ejectment, and thereafter the wharf can be managed by the State according to its own views of public good. (Ang. on Tide Waters, 218.)

It is thought that there is no case in the books in which a Court of equity, as such, has ever abated or enjoined a purpresture simply on the ground that it was one. The judicial department of the English Court of Exchequer is divided into one of equity and one of law; and the primary business of the former is to recover lands belonging to the Crown; so that purprestures upon arms and creeks of the sea are the proper subjects of information in that Court. (1 Ang. on T. W.; *Attorney-General* v. *Richards*, 2 Anst. 606; *Attorney-General* v. *Johnston*, 2 Wils. Ex. R. 101.) The title to the soil is in the King by private right (*jus privatum*,) subject, however, to the public right (*jus publicum*,) of fishery and navigation; and the Attorney-General may proceed, for the purpose of protecting the private right from the purpresture or the public right from the nuisance, by information on the King's remembrancer's side of the Exchequer, by English bill, praying a personal decree against the defendant in the suit. The question of nuisance, as being a matter of fact, the Court may determine on evidence, or it may direct an issue (*Attorney*

*General* v. *Parmenter*, 10 Price, 378; *Attorney-General* v. *Barridge*, Ib. 350.) If the erection complained of appears to be a purpresture without being at the same time a nuisance, the Court may direct an inquiry to be made whether it would be more beneficial to the Crown to abate the purpresture or to suffer the erection to remain and be arrented; but if the purpresture were also an injury to the public right of fishery and navigation, with which the Crown has nothing to do except to conserve them, no such inquiry will be had, and the nuisance will be decreed to be abated. (2 Story's Eq. Juris., Secs. 233, 922; Ang. on Tide Waters, 201; 2 Anst. 606.)

From this it would seem that in the Exchequer, when it appears that the purpresture is a nuisance, that is, an injury to the *jus publicum*, a decree to abate follows as a matter of course; but if it is found, as in the case at bar, that the purpresture is not a nuisance, then, so far as the public stands related to the proceedings, the suit is at an end, but the information is retained for the purpose of ascertaining the effect of the purpresture on the private right of the King; and the decree, allowing the purpresture to stand or adjudging its destruction or removal, depends upon the result of the inquiry. This procedure is clearly referable to the peculiar relation existing between the Exchequer and the Crown, and it was so considered by Chancellor Kent in *Attorney-General* v. *Utica Insurance Company*, 2 J. Ch. 381.

When the District Court found that the wharf in question would work no detriment to the public rights, of which the State is but the conservator, it could not do otherwise than deny the injunction and dismiss the bill, unless it can be made out that the District Courts in this State bear the same relation to the State as a property owner, and to the State revenues as that borne by the English Exchequer to the Crown and its revenues; and we conceive that those Courts stand in no such relation.

The equity jurisdiction with which our District Courts are invested under the Constitution is that administered in the High Court of Chancery in England. They are not, like the

English Exchequer, specially charged with the collection of debts due to the State, nor with the collection of the public revenues; nor are they organized with any especial reference to the recovery or protection of State lands, whether above or below the level of tide water. They will protect such lands by injunction, but it is only in cases where like protection would be given to the lands of individuals—that is, in cases of threatened injuries which, if committed, would be irreparable at law. To that intent the justice administered is preventive and not remedial. But we are at loss to conceive upon what ground it can be claimed that the District Courts in the exercise of remedial justice can, with a jury or without it, decree the demolition of any erection upon the public domain for the reason simply that it was put there without leave. In a case reduced to that degree of meagreness, not only is the nuisance feature wanting, and the irreparable damage feature also, but the case has no damage in it; and, furthermore, it might appear, as a fact in the case, that the purpresture was positively and largely beneficial. If a District Court can in the exercise of its equitable powers decree the destruction of a purpresture as such, then it can do in equity what cannot be done in this country on indictment, (Ang. on Tide Waters, 209,) and the power furthermore must proceed from a source entirely foreign to the principles upon which the equity jurisdiction is admitted on all hands to be founded.

Again, wharves in themselves considered are not of evil consequence, but the reverse, and we consider that neither the District Courts nor any other Court can prevent their erection or decree their destruction simply upon the ground that they are erections upon public lands, placed or to be placed there without license. It is enough, that parties volunteering in the business can acquire no rights as against the State; that the State may, through the proper executive agencies, at any time take possession of its own, or recover possession thereof by judicial proceedings, and being in possession, that the executive department, through the officers to whose discretion the economical question may have been

intrusted, can preserve them if useful, or abate them if they cannot be made to contribute to the public good. The Courts can order them to be abated only when they are found to be pernicious.

The English Exchequer even, specially charged as it is with the collection of the King's debts and duties, and with the ordering of his revenues and the protection of his property, is not in the habit of decreeing the abatement of wharves, or moles, or embankments on the line of navigable waters, upon the ground of purpresture merely, but considerately stays its hand until it has determined whether the marine revenues of the Crown will be helped or damaged by demolition. In this State the District Courts, as already stated, cannot halt in the exercise of their judicial powers upon any such question; but it does not therefore follow that they should or can blindly decree the destruction of every unlicensed pier and bulkhead in the State for no better reason than it is unlicensed; but on the contrary, it would seem if they cannot, like the English Exchequer, abate intelligently in cases of pure purpresture, that they ought not, in such cases, to abate at all. Lord Holt says : "Where the soil is the King's, the building below the high water mark is purpresture, and encroachment or intrusion upon the King's soil, which he may either demolish, or seize, or arrent, at his pleasure." The State, in cases of mere purpresture, has the same powers in respect to its tide water lands, but the Courts can neither determine nor know its "pleasure" concerning the alternatives mentioned. They are incompetent to decree that a naked purpresture should be "seized" or "demolished," for the same reason they cannot decree that it shall be "arrented." The course to be pursued in such cases depends upon sovereign "pleasure," and therefore it cannot be turned into a question of public justice.

So far as we are advised, there is no American case, at least, in which the power here claimed for the District Courts to abate mere purprestures upon tide lands has ever been exercised. On the contrary, the Courts have uniformly refused to interfere in such cases, unless the erection complained of

was a nuisance or threatened irreparable damage. Of these cases the one cited from 2 Green is a sample.

By the civil law, to repair and strengthen the banks of public rivers is permitted as being most useful, provided navigation be not impeded; and one who built a mole into the sea was protected if no one was injured thereby. The judicial decisions in the maritime States of the Union, recognizing the usages of the people as moulded by the necessities of a new country, have been conceived to some extent in the same spirit. Should we hold that wharves and other like improvements upon all the navigable waters in this State may be abated in equity for no better reason than that the State did not formally license their erection, we should go further than any American Court has ever gone, and if the innovation were not followed by results greatly prejudicial to fishery and navigation, the credit of the escape would not belong to the doctrine.

We do not intend in this opinion to deny the power of the State to deal with its tide water lands through the legislative and executive departments of the Government, in such manner as shall be thought most conducive to the public good. All that we intend to decide is that the District Courts have no power to decree the destruction or to enjoin the erection of a wharf, unless it is or will be a nuisance, or is or will be followed by some form of irreparable damage, or unless it is or will be an appreciable hindrance to the execution of some legislative Act relating to fishery or to commerce or navigation.

The order appealed from is reversed, and the judgment is affirmed.