# THE TERRITORY OF HAWAII *v.* L. B. KERR.

### APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

ARGUED DECEMBER 7, 1904.   DECIDED JANUARY 7, 1905.

FREAR, C.J., HARTWELL, J., AND CIRCUIT JUDGE ROBINSON IN

PLACE OF HATCH, J.

LITORAL PROPRIETOR—*boundary "along the sea"—no right to construct a concrete wall and build a residence on the shore between high and low water.*

> The defendant whose lot, as shown by its land commission award, is bounded "along the sea" constructed a concrete wall on the shore in front of his lot between high and low water, a corner of the wall projecting a few feet beyond low water, and was filling the space enclosed by the wall with coral and sand so as to raise the surface above the low water line, with the intention of making a house lot for a seaside residence. Held: Following *Gay v. Halstead*, 7 Haw. 587 (1889), that the defendant's land extended to and along the line of high water.

ID., PURPRESTURE—*remedy— irreparable damage—Territory as plaintiff.*

> The defendant's concrete wall is a purpresture, encroaching

upon public territory and rights in the shore. A bill for injunction requiring the removal of the obstruction caused by the wall and enjoining its renewal can be maintained by the Territory under the provisions of section 91 of the Organic Act, giving it the possession, control, maintenance and care of all public property ceded to the United States by the Republic of Hawaii. The bill sufficiently avers irreparable damage.

### OPINION OF THE COURT BY HARTWELL, J.

This was a bill in equity brought by the Territory to restrain the defendant from proceeding with the erection of a seaside residence immediately in front of a lot owned by him at Waikiki on the island of Oahu, and to require him to remove a concrete wall made there, which he was filling in with coral and sand, above which the residence was to be erected, and to restrain him from further construction or filling in. The following are the averments in the bill:

"I. That L. B. Kerr, defendant, is in possession of and claims to own in fee simple a certain piece or parcel of land in Waikiki, island of Oahu, described in Land Commission Award No. 10677, being apana 2 thereof, a copy of which land commission award is hereto attached and made a part hereof, marked Exhibit A. That out of the said land described as apana 2 in said award a portion of said land was conveyed to the Territory of Hawaii by deed of D. Kawananakoa and J. Kalanianaole dated the 30th day of August, 1902, and recorded in the office of the registrar of conveyances in Honolulu in book 241 at page 450, said lot being described therein as the first lot conveyed by the said deed and more fully described in Exhibit B attached hereto and made a part hereof.

"II. That makai, or seaward of the makai line of said lot above described the sea frontage on said lot has been extended by gradual accretion of sea sand to such an extent that the original (present?) high water mark is makai or seaward of the present makai line of the Waikiki road as laid out and crossing the frontage of the said Land Commission Award 10677, apana 2.

"III. That there is an easement in the public for a right of way for a public road across the accretions to the said lot between the old mauka or landward line of the Waikiki road,

said line being the original makai or seaward boundary of the lot above described and the old seaward or makai side of the Waikiki road.

"IV. That the said lot has acquired by accretion a portion of land seaward or makai of the makai line of the present Waikiki road in front of the said lot and running to ordinary high water mark. That the land so acquired is described in Exhibit D· hereto attached and made a part hereof.

"V. That the title to the land seaward or makai and in front and adjoining the above described land as set forth in Exhibit C, (the water lot occupied by defendant) and also the lot within the lot described in Exhibit C described in Exhibit E, (being that portion of the enclosure below low water mark, and for one marine league to sea from low water mark) is and was. at all times herein mentioned in the United States of America. as successor to the Republic of Hawaii, and Kingdom of Hawaii its predecessor, subject to be maintained, managed and cared for by the Territory of Hawaii, until otherwise provided for by Congress or taken for the uses and purposes of the United States. by the direction of the President or of the Governor of Hawaii. That the right to the possession, control, management, use, income and benefit of the said lands owned by the United States of America is in the Territory of Hawaii, except such portion thereof, as may be taken for the uses and purposes of the United States by the direction of the President or of the Governor of the Territory of Hawaii, subject however, to the riparian rights of the owner of the said frontage to have access to navigable waters in front of his said lot.

"VI. That the lands above described have not been taken for the uses and purposes of the United States either by direction of the President or of the Governor of the Territory of Hawaii nor at all. And that the right to the possession, use, control and management of the said lands is in the Territory of Hawaii, subject to certain public fishing rights and of taking stone from rocks and of the rights of riparian owners therein.

"VII. That on or about the 19th day of February, 1903, defendant began the construction in front of his said premises described in Exhibit A of a concrete wall 110 feet long more or less, about two feet thick and about five feet high, extending in a direction approximately parallel to high water mark, which said wall is on ordinary low water mark on the northerly or Honolulu end of said wall and about 39 feet seaward of ordi-

nary high water mark and about 46.6 feet seaward from the ordinary high water mark on the southerly or Diamond Head ·end of the said wall and that the said L. B. Kerr or his agents have completed the said wall and a wall running from the Honolulu end of said wall to and beyond high water mark and along the northerly line of his said lot of like material and of .about the same level and said Kerr is now constructing another and similar wall from the Diamond Head side of said wall to and beyond high water mark and along the southerly line of said lot and the said L. B. Kerr or his agents are now filling in the ·space between the said wall and high water mark with coral and sand so as to raise the surface above the low water line. That the said wall and the said filling in is not within the lines of the property or accretions thereon belonging to and described in the said Land Commission Award 10677. That said structure as plaintiff is informed and believes is not erected as a quay or mole for the purposes of aiding or assisting the owner in using the said premises for the purposes of navigation or fishery, but that said owner intends to use said premises for purposes other than those connected with such use of his lot, to wit, as a house lot for a seaside residence.

"VIII. That the said wall and the filling in and the wall now constructed are so constructed without right upon the property belonging to the United States and contrary to the rights of the plaintiff herein. That the defendant as your petitioner is informed and believes and therefore alleges, claims the right to so construct the wall as aforesaid and to add thereto additional walls as above described and to fill in the land as aforesaid to the level of the said walls to the height as aforesaid and will complete the said walls and the filling in of said land and is now filling in said land, unless restrained by a physical force or by injunction from this court.

"IX. That the construction already completed does and structures in process of completion and threatened to be erected will interfere with the rights of fisheries and of navigation by fishermen within the limits aforesaid and of the right of pass- ing between high and low water mark common to the public. And that the structures do and will interfere with navigation of canoes within the limits and below high water mark and that said work, if allowed to remain or if allowed to be completed as planned, will work irreparable damage to the rights and inter- ·ests of the Territory of Hawaii. That the plaintiff has no ade-

·quate remedy at common law and can have relief or protection only in a court of equity where matters of this nature are prop-·erly cognizable."

The defendant demurred to the bill upon ten grounds. His brief summarizes those grounds on which he relies as follows: "1. That the United States should be a party to the bill and that the Territory cannot sue alone. 2. That the suit involves questions of title to real estate which a court of equity should not take up. 3. That the defendant is not shown to have ·exceeded his rights in building the wall in question. 4. That the bill does not disclose a case of irreparable injury or that the wall is a nuisance." The circuit judge sustained the demurrer on the ground that if "the defendant's title to said lot ·extends only to high water mark, still it must be admitted that he possesses the rights of a litoral or riparian proprietor whose land is bounded by navigable water; and among those rights, which the law regards as property and of which one cannot be deprived without just compensation, are access to such navigable water from the front of his lot, the right to make a landing, ·embankment, wall, bulkhead, wharf or pier for his own use or for the use of the public, subject to the public right of navigation. * * * These rights, if they exist, must and can only exist by reason of the ownership of the upland, not in the own-·ership of the 'shore,' because title to the shore is in the sovereign or state. The existence and assertion, or claim to these rights, does not necessarily dispute the title of the state in and to the soil on the shore. * * * The fact that these rights of the land owner are property and have value, being appurtenant to his land and a part thereof, must not be overlooked. The owner ·certainly has the right to make all reasonable and proper use of such rights, and all presumptions should be construed in his favor until the contrary is made to clearly appear;" and finally, concluding the examination of the law on the subject, and while holding that "as a matter of law there can be no disposition made of tide lands in these islands until the Territory has been duly admitted as one of the sovereign states of the American

union," the judge ruled that "in the meantime, however, the owner of land fronting upon the seashore may enjoy his litoral rights which are appurtenant to his land so long as he does not interfere with public rights of navigation." On the ground that "the defendant in the erection of the structure in question was and is within his rights, that said structure is not a nuisance, and that it does not interfere with the public rights of fisheries or navigation," the judge sustained the demurrer.

It appears by the averments in the bill that the defendant's concrete wall in the front of his seaside lot is in the space between high and low water marks with the exception of one corner, which projects a few feet over low water mark. The plaintiff's attorney in argument, as well as in his brief, said that "for the purposes of argument it will be assumed that respondent owns to low water mark, whatever the interpretation of this language means," doing this, as he says, because he considers that the question of ownership in that space "is not vital to the issue in this case;" but inasmuch as the averments in the bill are that the title in that shore frontage is in the United States, (as shown by the description contained in the exhibit), the law of the case must be decided accordingly. The sea boundary of the defendant's land is described in the land commission award on which his title is based as running "ma kahakai," which in *Gay v. Halstead,* 7 Haw. 587 (1889), was held to mean "along the high water mark." That decision accords with the doctrine of the United States Supreme Court. "With regard to grants of the government for lands bordering on tide water, it has been distinctly settled that they only extend to high water mark, and that the title to the shore and lands under water in front of lands so granted enures to the state within which they are situated, if a state has been organized and established there. Such title to the shore and lands under water is regarded as incidental to the sovereignty of the state—a portion of the royalties belonging thereto and held in trust for the public purposes of navigation and fishery—and cannot be retained

or granted out to individuals by the United States." *Hardin v. Jordan,* 140 U. S. 381.

The defendant ably argued that the common law secured shore rights to proprietors holding grants upon the shore until the "insidious Digges" and the needs of the royal purse secured for Charles I. judicial decisions which "in theory" nullified such rights; a modification of the law which, the defendant claims, has not been adopted in the states and is not in harmony with justice or public interests. The argument is interesting as a historical study, but under the decision in *Gay v. Halstead* the defendant's claim of ownership of the shore is not open for discussion. When land grants include the shore, whether by custom, prescription or express terms, the ownership is subject to the *jus publicum,* including the right of public use for purposes of navigation and fishery. Such limitations of ownership do not apply to cases where there is no grant of the shore express or implied, and no prescriptive claim thereto. "Maintenance of structures in the waters in the absence of public grant is by sufferance and not by right." 1 Farnham on Waters, 209, citing *Walsh v. Hopkins,* 22 R. I. 418, which sustains the text. The immunity with which litoral proprietors whose grants are bounded by the shore may construct and maintain below high water mark wharves, landings and piers not interfering with or obstructing navigation, rights of way or of fishing may be termed a right incident to such proprietorship or otherwise designated; but to erect wharves, landings and piers on the shore when the shore is owned by the United States cannot be regarded from the point of view of the public interests as the same with the erection of residences. The former allow access to boats, although they may otherwise impede or block the public right of way over that part of the beach on which they rest. Access to them may be obtainable elsewhere than from the shore lots of the proprietor who erects them. The defendant's structure when completed by filling in the wall would raise the space to a level above high water mark. The entire shore could thus be appropriated by coterminous owners. Purpresture is defined

by Worcester as "any encroachment upon or enclosure of that which should be common or public, as upon highways, rivers, harbors, ports, etc." Obstruction is defined as "that which obstructs or impedes, obstacle, impediment, hinderance."

"Where there is a house erected or enclosure made upon any part of the king's demesnes, or of a highway or common street, or public water, or such like public things, it is properly called a purpresture." 4 Bl. Comm., 167. Coke defines purpresture as "a close, or enclosure, that is, when one encroaches, or makes that several to himself, which ought to be common to many." 2 Inst. 38, 272. In *King v. Russell et al.*, 6 B. & C. 566, the defendants were acquitted upon an indictment for a nuisance in the river Tyne in having erected upon the said river ten geers (consisting of piles driven into the bed of the river on the bed of which a platform and railway were laid), "by means whereof, the navigation, course, stream, and passage of, in, through, along, and upon the said river, and the king's ancient, common, and public highway thereon, etc., and from thence continually up to that time had been and still were greatly straitened, narrowed, lessened, obstructed, and blocked up." The court instructed the jury that "the use of a navigable river was not for passage only, but for other important rights which might supersede the right of passage. That when a great public benefit accrued from that which occasioned the abridgment of the right of passage, that abridgment was not a nuisance, but proper and beneficial." On a rule *nisi* for entering a verdict of guilty or for a new trial the defendants cited Lord Hale, who says: "It is not every building below the high water mark, nor every building below the low water mark, that is *ipso facto* in law a nuisance, for that would destroy all the quays that are in all the ports of England, for they are all built below the high water mark, for otherwise vessels could not come at them to unload; and some are built below the low water; and it would be impossible for the king to license the building of a new wharf or quay, whereof there are a thousand instances, if *ipso facto* it were a common nuisance; for the king cannot license a com-

mon nuisance. Nay, in many cases it is an advantage to a port
to keep in the sea water from diffusing at large; and the waters
may flow in shallows, where it is impossible for vessels to ride.
Indeed, where the soil is the king's, the building below the high
water mark is a purpresture, an incroachment, an intrusion on
the king's soil, which he may either demolish, or seize, or arent
at his pleasure; but it is not *ipso facto* a common nuisance,
unless, indeed, it be a damage to the port and navigation. In
the case therefore, of a building within the extent of a port, in
or near the water, whether it be a nuisance or not is *quaestio
facti,* and to be determined by a jury, on evidence, and not
*quaestio juris."* The defense claimed that if in *Rex v. Grosve-
nor,* 2 Stark. 511, there had been a shewing of "compensation to
the public" an acquittal would have been ordered, although the
chief justice charged the jury: "The public have a right to
all the convenience which the former state of the river afforded,
unless by the change some greater degree of convenience is ren-
dered; * * * although the public were not able to enjoy this
benefit, namely, that of a recess in the river, closed up by Lord
Grosvenor's embankment, at all times; yet if they could derive
benefit from it for the space of two hours each tide, they are
entitled to that advantage, unless the want of it be compensated
by some superior advantage resulting from the alteration." It
was admitted that if this had been "an information for a pur-
presture, it might have been necessary to the defense to have
shewn either a writ of *ad quod damnum* executed in the defend-
ants' favor, and a license thereon from the crown or a patent.
* * * But on the trial of an indictment like the present, the
writ of *ad quod damnum* is immaterial." Brougham, Tindal,
Alderson and Parke appeared for the prosecution, contending:
"First, that where a public right is infringed, that cannot
legally be done without the sanction of a writ of *ad quod dam-
num,* and the king's license, although an equivalent be given,"
referring to *Atty. Gen. v. Brittain,* MSS., an application for an
injunction to stop the building of a quay on the river Mersey,
in which the chancellor "directed an issue to try whether it

was an injury to the port and harbor of Liverpool; and that it was not his intention to direct any trial as to the question, whether it was an injury to the navigation on the river Mersey, because it was his opinion that the *tide wave of a river in the shallowest part of it could not be interrupted by buildings of that sort, unless there had been an antecedent execution of a writ of ad quod damnum by a jury.*" It was further contended that "the plea of not guilty puts the fact of the obstruction by the defendant, and that only, in issue; and the simple question for the consideration of the jury is, whether the party accused has or has not occasioned the obstruction." The court discharged the rule and thought the verdict ought to stand, pointing out that "the only objection to the geers is, that they are unlawful, as being a public nuisance to the navigation. *The defendants' right to have them there, and to continue and use them, is not impugned on any other ground.*" The following remarks of the court are in point in the present case: "But it is objected that they are at all events illegal, for want of a writ of *ad quod damnum,* and a favorable return of the inquisition thereof;" on which point the court said: "This is not like the case of shutting up a public highway, and setting out another in lieu; that cannot be done so as to do away the former public right, and to create a new public right, without a writ of *ad quod damnum.* The former can only be abrogated by the writ of *ad quod damnum,* and the proceedings, and the king's license thereon; but that is not requisite here, as I conceive, whether the mode of enjoyment in question of some of the public rights of the port, river, and navigation, is or constitutes in fact a public nuisance? If that mode of enjoyment be not, in fact, such a nuisance, it does not, as I conceive, become so for want of the writ of *ad quod damnum, though, without such a writ, and a favorable inquisition thereon, they who erect or do those works act at their peril;* and though the want of such a writ may be a good ground for the lord chancellor's interfering for the security of the public, and by injunction restraining any person from erecting works or buildings that interfere with the exercise of a public

right, till it be ascertained by the writ of *ad quod damnum,* that their so doing is not a public nuisance or injurious to the king or his subjects."

The case shows that in an indictment for a public nuisance from structures in public waters the defendant may show the public gain as an offset to its loss, and yet that those who erect them would "act at their peril" of an information for a purpresture. The contention of the eminent counsel in that case, that the infringement of a public right without regard for countervailing benefits can be restrained in equity has been sustained in later decisions. In *Atty. Gen. v. Terry,* 9 L. R. Ch. App. Cas. 423, the defendant had driven piles into the bed of a river, extending the wharf so as to occupy three feet out of a breadth of sixty feet available for navigation. The information was based upon two grounds; one, that the structure would be a nuisance in impeding navigation, and the other that "the defendant has no right to erect such structure and ought to be restrained by injunction, quite independently of the fact of there being an actual nuisance or not." In ordering an injunction Sir G. Jessel, M. R., said of the case of *Rex v. Russell,* "In my opinion that case is not law, and it is right to say so in the clearest terms," citing cases which fully sustained him, and further saying, "It is not an answer to say that at this moment the obstruction is not a nuisance. It may become so. * * * It is for that reason so important that a person complaining of the obstruction, though not able to maintain an indictment for nuisance because an actual nuisance has not yet been committed, should be able to come to a court of equity and ask that court to restrain the continuance of that obstruction." The decree was sustained on appeal, James, L. J., concurring and saying, "Where a public body is entrusted with the duty of being conservators of a river, it is their duty to take proceedings for the protection of those who use the river." The defendant relies on *People v. Davidson,* 30 Cal. 379, in which the court says: "It is thought that there is no case in the books in which a court of equity, as such, has ever abated or enjoined a purpresture

simply on the ground that it was one." Of that decision two things are to be said: First, that it was a wharf which was sought to be abated as a nuisance, and as the court said, "Wharves in themselves considered are not of evil consequence, but the reverse;" and secondly, that there are both American and English decisions directly opposed to that case. A similar decision apparently was made in *Atty. Gen. v. Del. R. Co.,* 27 N. J. Eq. 17, which held that a bridge across the Delaware river is not a public nuisance merely because it is unauthorized. On the other hand, the following cases are to the effect that a mere purpresture on public lands may be enjoined in equity. *U. S. v. Ranch Co.,* 25 Fed. 465, (Miller, J.); *U. S. v. Same,* 26 *Ib.* 218, (Brewer, J.), the court saying, "Generally speaking, any encroachment upon the public domain may be restrained or ended by injunction." *U. S. v. Cattle Co.,* 33 *Ib.* 323, the court by Brewer, J., saying, "As the legal title is in the government, the presentation of that title casts upon the defendant the duty of establishing its equities." "Any unauthorized appropriation of public property to private uses amounting to a purpresture or public nuisance, is within the jurisdiction of equity to enjoin." 1 High on Injunc., Sec. 760.

In *People v. Vanderbilt,* 38 Barb. 282, 26 N. Y. 287, and 28 *Ib.* 396, the defendant was engaged in making a pier in New York harbor in the North river, having made a crib which was to be filled with stones and to constitute a part of the pier. Suit was brought to restrain the defendant from proceeding with the erection of the pier and to compel the removal of the part already built "as an encroachment upon the harbor, an obstruction to navigation *and therefore a public nuisance.*" The court (26 *Ib.* 293) distinguished between "the right of property in the soil or bed of a navigable river or arm of the sea and the right to use the waters for purposes of navigation," the first of these rights being vested in the people and capable of alienation to an individual or corporation, and the second being "a right common to the whole people and it is vested in the people at large." The judgment of the supreme court at its

general term (38 Barb. 282), was affirmed, 26 N. Y. 298. The following extracts are from the opinion of the court at the general term: "Without a grant or authority from the sovereign power, every obstruction of a navigable river will be a nuisance, and no evidence need be given of the extent to which the public right is impaired or the public use of the river impeded. It is sufficient that the public domain which is devoted to a public use is invaded in a way to deprive the public of the use of any part of it. In case of a grant or license to erect a dam, pier or dock, or wharf, or other obstruction in a navigable stream, it could not be held a nuisance, without proof of the fact that the public damage and injury resulting from the obstruction greatly exceeded the public benefits of the erection, and perhaps not even upon proof of an entire destruction of *jus publicum*. But any obstruction placed in a public way without right—and a public navigable river stands upon the same footing as a highway—would be a nuisance, and the courts will not inquire whether the advantage arising from the act complained of would compensate for all the injury and inconvenience which the public would suffer from it. * * * Among other remedies for an obstruction of public navigation, courts of equity will grant an injunction to prevent a threatened or attempted obstruction." 38 Barb. 286-7. The court of appeals (28 N. Y. 396) affirmed the judgment of the supreme court, saying: "The crib sunk by the defendant and the proposed pier were a purpresture, and were *per se* a public nuisance. The offer, therefore, of the defendant's counsel to prove, by the testimony of witnesses, that the crib and proposed pier were not and would not be, an actual nuisance, and would not injuriously interfere with or affect the navigation of the river or bay, was properly overruled. The remedy to prevent the erection of a purpresture and nuisance in a bay or navigable river is by injunction at the suit of the attorney general." "This court has jurisdiction to restrain any purpresture or unauthorized appropriation of the public property to private uses, which may amount to a public nuisance or may injuriously affect or endanger the public inter-

est." *Atty. Gen. v. Cohoes Co.,* 6 Paige 135. The defendant's wall is a purpresture which he can be required to remove and restrained from renewing.

By the provisions of section 91 of the Organic Act the public property ceded to the United States by the Republic of Hawaii "shall be and remain in the possession, use, and control of the government of the Territory of Hawaii, and shall be maintained, managed, and cared for by it, at its own expense, until otherwise provided for by Congress, or taken for the uses and purposes of the United States by direction of the President or of the governor of Hawaii. * * * " In performing this duty of maintaining, managing and caring for the public property thus placed in its possession the Territory may properly require the removal of obstructions to public rights upon that portion of the seashore which is outside of high water mark, and this may be done by resorting to a court of equity for relief. The bill sufficiently describes the obstructions placed and intended to be placed by the defendant on the shore (as that portion of the shore which is between high and low water marks may be termed), owned by the United States. "The ground of this jurisdiction, in cases of purpresture, as well as of public nuisance, is the ability of courts of equity to give a more speedy, effectual and permanent remedy than can be had at law. They can not only prevent nuisances that are threatened, and before irreparable mischief ensues, but arrest or abate those in progress, and by perpetual injunction protect the public against them in the future." *Missouri v. Illinois,* 180 U. S. 245, 45 L. E. 513. It is not so much the extent of this obstruction or the irreparable injury to the public which it now causes, that requires its removal, as the fact that as far as any obstruction can do so it prevents public use of the shore for passage over it, and that if allowed to go on to completion it would appropriate public territory to private use for no purpose conducive to public interests. Walls and buildings extending seaward beyond high water mark block the right of way and furnish no compensatory advantages to the public for purposes of navigation or fishery.

The decree of the circuit judge sustaining the defendant's demurrer is reversed, the demurrer is overruled and the case is remanded to the circuit judge for such further proceedings as shall be appropriate.

*Lorrin Andrews, Attorney General* and *P. L. Weaver* for the Territory.

*Kinney, McClanahan & Cooper* and *S. H. Derby* for defendant.