CIVIL AERONAUTICS BOARD, Hawaiian Airlines, Inc., and Aloha Airlines, Inc., Plaintiffs,

v.

ISLAND AIRLINES, INC., Defendant.

Civ. No. 2162.

United States District Court
D. Hawaii.

Oct. 8, 1964.

J. William Doolittle, Atty., Civ. Div., Dept. of Justice, Washington, D. C., Herman T. F. Lum, U. S. Atty., Dist. of Hawaii, Honolulu, Hawaii, for plaintiff.

Frank D. Padgett and Burnham H. Greeley, of Robertson, Castle & Anthony, Honolulu, Hawaii, for defendant, Island Airlines, Inc.

J. Russell Cades and William M. Swope of Smith, Wild, Beebe & Cades, Honolulu, Hawaii, for Aloha Airlines, intervenor.

Richard K. Sharpless, of Lewis, Buck & Saunders, and Allen M. Stack, of Pratt, Moore, Bortz & Vitousek, Honolulu, Hawaii, for Hawaiian Airlines, intervenor.

Bert Kobayashi, Atty. Gen., of Hawaii, by Arthur Fong, Deputy Atty. Gen., Honolulu, Hawaii, for State of Hawaii, amicus curiae.

PENCE, Chief Judge.

### Foreword

On April 24, 1964 the United States Court of Appeals for the Ninth Circuit, 331 F.2d 207, remanded this case to this court with instructions that this court should rule expressly on the boundary or boundaries of the State of Hawaii, and in order properly to present the problem in the event of subsequent appeal from this decision, this court was further instructed to vacate its final decree, make findings anew, and enter a new decree. The final decree has been vacated.

Inasmuch as this court in its decision of August 8, 1963, comingled its findings of fact with its conclusions of law, in this Decision After Remand the court feels it necessary to and will rewrite (in many portions, copy) its decision of August 8, 1963.

### History of the Case

The defendant, Island Airlines, Inc. (Island), on May 20, 1960, filed an application with the Public Utilities Commission of the State of Hawaii (PUC) for authorization to fly a cut-rate, "sky-bus" type of air transportation of passengers between the various major islands comprising the State of Hawaii (State), which proposed routes included flights between Honolulu, on the island of Oahu, and the island of Kauai, and between Honolulu and the islands of Molokai, Maui, and Hawaii. The PUC at that time decided that it did not have jurisdiction over interisland air transportation until the expiration of the transition period between Territorial and State government, viz., August 21, 1961, and dismissed the application.

Another application to the PUC was docketed on August 21, 1961, and after prolonged hearings, with Aloha Airlines, Inc. (Aloha) and Hawaiian Airlines, Inc. (Hawaiian) intervening, and the Civil Aeronautics Board (CAB) appearing as amicus, on August 16, 1962, the PUC made its order fixing rates for Island for intrastate transportation of passengers by air between the above major islands of the State. Thereafter, in the spring of 1963, without ever securing a certificate from the CAB authorizing it to engage in air transportation, and without attempting to comply with Section 401(a) (49 U.S.C. § 1371(a)) [1] of the

---

[1] "(a) No air carrier shall engage in any air transportation unless there is in force a certificate issued by the Board authorizing such air carrier to engage in such transportation."

Federal Aviation Act (Act), Island started carrying passengers on a DC-4 between Honolulu and Kauai, and Honolulu and Maui and Hawaii.

When, after notification by the CAB that it was operating in violation of Section 401(a) (49 U.S.C. § 1371) of the Act, Island persisted in its flights, the CAB on May 24, 1963, filed this complaint against Island for a declaratory judgment and permanent injunction, claiming that Island was an air carrier engaged in air transportation within the meaning of 49 U.S.C. § 1301(3), (10) and (21) (a) of the Act,[2] i. e., in interstate air transportation, without the CAB having issued it a certificate to do so.

The CAB claimed that since each of the islands between which Island was carrying passengers is separated from the others by high seas and open ocean, outside Hawaii's "territorial waters",[3] it was therefore impossible for Island to carry its passengers between the above major islands without passing through air space over a place outside of the State, and therefore such air carriage constituted interstate air transportation within the scope of the Federal Aviation Act. The CAB, therefore, asked that this court declare it to have exclusive jurisdiction to regulate the proposed air transportation of passengers by Island, and further asked that Island be permanently enjoined from the proposed air transportation of passengers between the above major islands of the State without first being issued a certificate of public convenience and necessity by the CAB under the Act.

At the time the complaint was filed, Island was actively flying passengers between Kauai, Oahu, Maui and Hawaii, and in rapid succession, temporary restraining orders were asked for by CAB, issued, and for various reasons, now immaterial, then dissolved.

Appeals from the order of the PUC of August 16, 1962, had been taken by intervenors in that hearing, viz., Hawaiian and Aloha, and on June 21, 1963, the Supreme Court of the State of Hawaii in the Matter of the Application of Island Airlines, Inc., 47 Haw. 1, 384 P.2d 536, held in essence that, absent the problem of carrying passengers in interstate commerce within the purview of United States v. Capital Transit Co., 325 U.S. 357, 65 S.Ct. 1176, 89 L.Ed. 1663 (1945), air transportation of passengers between the major islands of the State constituted intrastate, rather than interstate air commerce within the scope of the Act, and therefore CAB jurisdiction does not exclude PUC jurisdiction over such intrastate flights.

The Supreme Court of Hawaii did not set forth all of the factors which it considered in arriving at the above conclusions, but promised a supplemental opinion later.

Final hearing and argument on CAB's complaint in this court was held on July 15, 1963. After the matter was submitted, on July 22, 1963, the Supreme Court of Hawaii in the same Matter of the Application of Island Airlines, Inc., 47 Haw. 87, 384 P.2d 536 filed its Supplemental Opinion to its June 21, 1963

---

2. "(3) 'Air carrier' means any citizen of the United States who undertakes, whether directly or indirectly or by a lease or any other arrangement, to engage in air transportation * * *."

"(10) 'Air transportation' means interstate, overseas, or foreign air transportation or the transportation of mail by aircraft."

"(21) 'Interstate air transportation', 'overseas air transportation', and 'foreign air transportation', respectively, mean the carriage by aircraft of persons or property as a common carrier for compensation or hire or the carriage of mail by aircraft, in commerce between, respectively—

"(a) a place in any State of the United States, or the District of Columbia, and a place in any other State of the United States, or the District of Columbia; or *between places in the same State of the United States through the airspace over any place outside thereof;* or between places in the same Territory or possession of the United States, or the District of Columbia;" [Emphasis added].

3. Hawaii State Admissions Act (§ 2, 73 Stat. 4) Public Law 86-3, 86th Cong.

opinion. This court, therefore, has had the advantage of the Hawaii Supreme Court's analysis of the scope of the Act in its application to the problem posed by the unique geographical makeup of the State.

Although Island raised several objections to this court assuming jurisdiction over this case, as indicated in this court's ruling of June 7, 1963, on Island's motion to dismiss, this court decided that a federal question was properly presented to this court, inasmuch as no problem is presented other than the determination by this court whether Island is carrying on air transportation in violation of Section 401(a) of the Act.

The problem concerns the rights of a federal regulatory agency charged with the statutory responsibility, by virtue of § 1007 of the Act, for the regulation of interstate air transportation, claiming that an air carrier is transporting passengers in Hawaii in interstate air transportation under the Act, in violation of § 401(a). This court, therefore, has jurisdiction over the subject matter under 28 U.S.C. § 1345.

This court on August 8, 1963 ruled in favor of CAB and issued a permanent injunction against Island operating in the manner above indicated without first being issued a certificate of public convenience and necessity by the CAB.

Island perfected an appeal to the Ninth Circuit Court of Appeals which, after hearing, remanded the case to this court, as above indicated. Following remand, Aloha and Hawaiian were permitted to intervene as parties plaintiff. The State of Hawaii petitioned for leave to intervene as a party defendant, then, before hearing, withdrew its petition and asked for and was granted leave to appear as amicus only.

4. Island Airlines, Inc. v. Civil Aeronautics Board, 331 F.2d 207 (9th Cir. 1964).

5. Exhibit 2—Distances between the closest points of land in the respective islands.
KAUAI TO OAHU—62.9 nautical miles
OAHU TO MOLOKAI—22 nautical miles
MOLOKAI TO MAUI—7.5 nautical miles

The evidence and argument presented before this court thereafter, was almost entirely confined to "the root of the problem * * * [viz.] where is the boundary or boundaries of the State of Hawaii?" [4]

*Findings of Fact and Conclusions of Law*

As Exhibit C shows, the major islands making up the State of Hawaii are separated from each other by the waters of the North Pacific Ocean, and the distances between the islands of Kauai and Oahu, Oahu and Molokai, Molokai and Maui, and Maui and Hawaii, over the channels in between, vary from the shortest: Molokai-Maui, 7.5 nautical miles, to the longest: Kauai-Oahu, 62.9 nautical miles.[5] Because of these distances, combined with the complete absence of protective land masses lying anywhere near the islands on the northeast side of the island chain, and, except for the islands of Lanai and Kahoolawe, an equal absence of any land masses on the southwest side of the chain, there is nothing to break up the great swells of the North Pacific waves which, unimpeded, roll upon the shores and sweep through the channels between the islands.

Under the definition of "high seas" set forth in United States v. Rodgers, 150 U.S. 249, 14 S.Ct. 109, 37 L.Ed. 1071 (1893), the term applies to open, unenclosed, large bodies of water extending beyond one's vision (and included the Great Lakes as being bodies of water to which the term "high seas" was applicable). In U. S. v. Grush, 26 Fed.Cas. 48 (C.C.Mass.1829), the term "high seas" in its usual sense expresses "the open, uninclosed ocean, or that portion of the sea, which is without the fauces terrae on the sea coast," (at 51), in contradistinction to that which is surrounded or enclosed between narrow headlands or promontories.[6]

MAUI TO HAWAII—25.4 nautical miles
LANAI TO MOLOKAI—8 nautical miles
LANAI TO MAUI—7.65 nautical miles

6. The Convention On The High Seas, ratified by the President of the United States on March 24, 1961, and entering into force September 30, 1962, in codifying the

The Supreme Court of Hawaii in its July 22, 1963 Supplemental Opinion, supra, determined that the words "over any place" as used in the Act refer to a "place" which itself has boundaries, not international waters which are a "no man's land" outside the boundaries of any place, and demanded that in order for those words of the Act to have any application, the air transportation must pass through air space over another state or a foreign country.

With all deference to that august body, this court cannot agree that air transportation over the high seas outside of the territorial limits of a state is not air transportation over a place outside of that state. "The declaration of what constitutes navigable air space is an exercise of the same source of power, the interstate commerce clause, as that under which Congress has long declared in many acts what constitutes navigable or non-navigable waters. The public right of flight in the navigable air space owes its source to the same constitutional basis which, under decisions of the Supreme Court, has given rise to a public easement of navigation in the navigable waters of the United States, regardless of the ownership of the adjacent or subjacent soil." H.R.Rep.No.572, 69th Cong. 1st Sess., p. 10.

In Northwest Airlines v. Minnesota, 322 U.S. 292, 303, 64 S.Ct. 950, 956, 88 L.Ed. 1283 (1944), Mr. Justice Jackson in a concurring opinion stated:

"Students of our legal evolution know how this Court interpreted the commerce clause of the Constitution to lift navigable waters of the United States out of local controls and into the domain of federal control. Gibbons v. Ogden, 9 Wheat. 1 [6 L. Ed. 23] to United States v. Appalachian Electric Power Co., 311 U.S. 377 [61 S.Ct. 291, 85 L.Ed. 243]. Air as an element in which to navigate is even more inevitably federalized by the commerce clause than is navigable water. Local exactions and barriers to free transit in the air would neutralize its indifference to space and its conquest of time.

"Congress has recognized the national responsibility for regulating air commerce. Federal control is intensive and exclusive. Planes do not wander about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands. The moment a ship taxis onto a runway it is caught up in an elaborate and detailed system of controls. It takes off only by instruction from the control tower, it travels on prescribed beams, it may be diverted from its intended landing, and it obeys signals and orders. Its privileges, rights, and protection, so far as transit is concerned, it owes to the Federal Government alone and not to any state government."

The United States Supreme Court in Lord v. Steamship Co., 102 U.S. 541, 543–544, 26 L.Ed. 224 (1880), in considering the case of the steamship "Ventura" while engaged solely in the transportation of goods and passengers between ports and places in California, but which, in making her voyages ran a distance of 480 miles on the Pacific Ocean, reconfirmed the fact that Congress has nothing to do with the purely internal commerce of the State, if such commerce is "con-

rules of international law relating to the high seas, agreed:

"Article 1

"The term 'high seas' means all parts of the sea that are not included in the territorial sea or in the internal waters of a State."

"Article 2

"The high seas being open to all nations, no State may validly purport to subject any part of them to its sovereignty. Freedom of the high seas * * * comprises * * * (4) Freedom to fly over the high seas * * *."

"Article 19

"On the high seas, or in *any other place* outside the jurisdiction of any State * * *." (Emphasis added).

fined exclusively to the jurisdiction and territory of that State", and does not "affect other nations or States or the Indian tribes", and continued by stating that while the contracts of carriage of the "Ventura" were in effect to carry goods from San Francisco to San Diego by way of the Pacific Ocean, such contracts—

"could not be performed except by going not only out of California, but out of the United States as well * * *. The Pacific Ocean belongs to no one nation, but is the common property of all. When, therefore, the Ventura went out from San Francisco or San Diego on her several voyages, she entered on a navigation which was necessarily connected with other nations. * * * She was not trading with [those other nations], but she was navigating with them, and consequently with them was engaged in commerce * * * and as such she and the business in which she was engaged were subject to the regulating power of Congress.

"Navigation on the high seas is necessarily national in its character. Such navigation is clearly a matter of 'external concern,' affecting the nation as a nation in its external affairs. It must, therefore, be subject to the national government."

Again, in The Hamilton, 207 U.S. 398, 28 S.Ct. 133, 52 L.Ed. 264 (1907) where from a collision between the S S Hamilton and the S S Saginaw, in which the Saginaw was sunk and some of its crew and passengers drowned, a wrongful death statute of the State of Delaware was being considered in a proceeding for the limitation of liability of the steamship, we find the Court saying, "the bare fact of the parties being outside the territory [of the State], in a *place* belonging to no other sovereign, would not limit the authority of the state * * *." [Emphasis added] 207 U.S. at 403, 28 S.Ct. at 134.

Also, in Noel v. United Aircraft Corp., 191 F.Supp. 557, 558 (D.C.Del.1961): "The decedent was on an airliner flying a foreign flag [Venezuela] when he met his death. According to all the authorities, the *place* where this tort occurred was the scene of the crash on the high seas * * *." [Emphasis added].

The Federal court in Hooker v. Raytheon Co., 212 F.Supp. 687 (S.D.Cal. 1962) found no difficulty in determining that deaths occurring when a vessel sank in the waters of the Santa Barbara channel more than one marine league from the California mainland or the closest channel island occurred on the high seas. Likewise in Guess v. Read, 290 F.2d 622 (5th Cir. 1961), the court readily found that when a death resulted from the crash of a helicopter in the Gulf of Mexico (flying from a drilling barge to the Louisiana shore) and the location of the barge and the situs of the crash was more than a marine league from the shore of Louisiana, the death occurred outside of the jurisdiction of the State of Louisiana.

In determining Congressional intent as to the application of the phrase, "through the air space over any place outside thereof" : one of the early drafts of a bill for the regulation of interstate air commerce (S. 3027, 74th Cong., 1st Sess., 1935), defined interstate commerce as "commerce * * * between places in the same state through another state. * * *" During the course of the hearings on S. 3027, Senator Wheeler, the chairman of the Sub-committee handling the bill, requested Mr. Joseph Eastman, Federal Coordinator of Transportation, to suggest corrections in the bill. In a letter dated July 31, 1935, Mr. Eastman stated (hearings before a Subcommittee on Interstate Commerce, U. S. Senate, 74th Cong., 1st Sess., on S. 3027, p. 68):

"It is suggested * * * that after the word 'through' in line 18 there be substituted for the words 'another state,' the words 'the air space over any place outside thereof.' *The latter change would include as interstate* commerce, transportation

between points in the same State over a foreign country or the *high seas* as well as over another state. [Emphasis added]"

The change suggested appears in all bills following the date of Mr. Eastman's letter and was contained, not only in § 1(21) of the Civil Aeronautics Act, but also in § 1(20) which defines "air commerce" in the Civil Aeronautics Act of 1938 (49 U.S.C. § 401(20)). The identical language thereafter was carried forward into the superseding Federal Aviation Act of 1958 (49 U.S.C. § 1301(20), (21)).

From the inception of the Civil Aeronautics Board, it has interpreted the Civil Aeronautics Act and the Federal Aviation Act as applicable to transportation between places in the same State where said transportation also involved passage through air space over the high seas. Wilmington Catalina Air v. Grandfather Certificate, 1 CAA 431.

A three-judge district court of the Ninth Circuit in United Air Lines, Inc. v. Public Utilities Commission of Cal., 109 F.Supp. 13, reversed on other grounds, 346 U.S. 402, 74 S.Ct. 51, 98 L.Ed. 140 (1953), passed upon the application of the definition of air transportation in the Civil Aeronautics Act of 1938 (the Act of 1958 is identical in this respect), in determining whether or not United flights from Los Angeles to Catalina Island, both of which were places within the State of California, over the Catalina Channel, constituted interstate air transportation under the Act. The court said:

"The record here shows, by stipulation, that there is a distance of about 30 miles between the shore line of the United States and the Santa Catalina Island. We have no difficulty in finding, and so find that a substantial portion of these 30 miles lies over the high seas and is not within the State of California. Hence it follows that air transportation through the air space thereover is over a *place* outside of the State

of California." [Emphasis added.] 109 F.Supp., at 16.[7]

That interisland flights in the State were expected to fall within the scope and control of the Act was clearly stated to the Subcommittee of the Committee on Interior and Insular Affairs of the United States Senate, as is shown by Senate Committee Report No. 80, 86th Congress:

*"Aviation matters*

"Hawaii presents a unique situation with respect to the impact of statehood on the Federal regulation of air transportation between the main islands. This is because of the geographical structure of the Territory, the land areas being separated by substantial expanses of ocean which are not included in the territorial limits of Hawaii. Hence, most, if not all, of the interisland air transportation passes through airspace not a part of the Territory. Under the provisions of the Federal Aviation Act of 1958 and other applicable Federal legislation, the Civil Aeronautics Board exercises economic regulatory jurisdiction over carriers engaged in interstate air transportation, which is defined to include not only transportation between a place in a State and a place in any other State, but also transportation between places in the same State through the airspace over any place outside thereof. Consequently, with the admission of Hawaii as a State, interisland air transportation will remain subject to the economic controls provided by the Federal Aviation Act including other applicable Federal legislation, because that transportation, or most of it, while between places in the same State, will pass through airspace outside the State. In the other States, air transportation of this kind passing through airspace outside the State is of slight volume in comparison with air transportation merely between places in the same State. In

7. See note 4, *supra*.

the case of Hawaii, the reverse would be true. The committee wishes to make it clear that it believes the application of the provisions of the Federal Aviation Act and other applicable Federal legislation to the State of Hawaii should continue in accordance with the definition of interstate air transportation as contained in that act." [8]

Island has urged that the channels between the islands of the State of Hawaii are within the boundaries of the State and therefore that flights between the islands are flights over the territorial waters of Hawaii and not through the airspace over any place outside of the State.

The Statehood Act itself (§ 2, 73 Stat. 4) says:

"The State of Hawaii shall consist of all the islands, together with their appurtenant reefs and territorial waters, included in the Territory of Hawaii on the date of enactment of this Act."

with certain exceptions not material here. Both Island and State now maintain that, because of its historical claims and hence right to the same when Hawaii was annexed by the United States in 1898, 30 Stat. 750, the channels between the islands, from Niihau to Hawaii, were within the boundaries of the nation of Hawaii (both of the Kingdom and succeeding Republic); that those same boundaries of the nation became the boundaries of the Territory of Hawaii; and that upon statehood being granted the Territory, that area which was within the boundaries of the nation of Hawaii thereby came within the boundaries of the new State.

These claims first arise out of the Second Act of Kamehameha III (Statute Laws of 1846, Vol. I, Chap. VI, Art. I, Sections I, II and III.):

"SECTION I. The jurisdiction of the Hawaiian Islands shall extend and be exclusive for the distance of one marine league seaward, surrounding each of the islands of Hawaii, Maui, Kahoolawe, Lanai, Molokai, Oahu, Kauai and Niihau; commencing at low water mark on each of the respective coasts of said islands.

"The marine jurisdiction of the Hawaiian Islands shall also be exclusive in all the channels passing between the respective islands, and dividing them; which jurisdiction shall extend from island to island.

"SECTION II. It shall be lawful for his Majesty to defend said closed seas and channels, and if the public good shall require it, prohibit their use to other nations, by proclamation.

"SECTION III. All captures and seizures made within said channels or within one marine league of the coast, shall be deemed to have been made, and shall be deemed to have entered in His Majesty's waters. The civil and criminal jurisdiction shall be coextensive with the one maritime league, and the interisland channels herein defined. And the right of transportation and transshipment from island to island, shall exclusively belong to Hawaiian vessels duly registered and licensed to the coasting trade, as in the two succeeding articles prescribed." [9]

8. Senator Jackson commented on page 58 of the same Subcommittee report:
"Senator Jackson * * * I say assuming that perhaps we should define territorial waters in the committee report so that appropriate legislative history is made, or by statutory provision, that the island boundaries are confined to the traditional 3-mile limit as described in the reports that you referred to, then Congress could occupy the field within the State that is made up of the several islands?
"Mr. Stevens. Yes; I would say if you define it that way Congress has occupied the CAB field."

9. There was a prior "claim": Kamehameha III by the Act of November 9, 1840, § 8, expropriated all fishing grounds and then gave "to the people: Fishing grounds without the coral reef, vis, the Kilohee

Four years later, the Privy Council of the Kingdom, by a Resolution of August 29, 1850, repeated the claim (3 Privy Council Record, p. 425):

"Resolved, that the rights of the king as sovereign extend from high water mark a marine league to sea, and to all navigable straits and passages among the Islands, and no private right can be sustained, except private rights of fishing and of cutting stone from the rocks, as provided and reserved by Law."

On May 16, 1854 the King issued the Kingdom's neutrality proclamation:

"Be it known, to all whom it may concern, that we, Kamehameha III, King of the Hawaiian Islands, hereby proclaim our entire neutrality in the war now pending between the great maritime Powers of Europe; that our neutrality is to be respected by all belligerents, to the full extent of our jurisdiction, which by our fundamental laws is to the distance of one marine league surrounding each of our islands of Hawaii, Maui, Kahoolawe, Lanai, Molokai, Oahu, Kauai, and Niihau, commencing at low-water mark on each of the respective coasts of said islands, and includes all the channels passing between and dividing said islands from island to island; that all captures and seizures made within our said jurisdiction are unlawful; and that the protection and hospitality of our ports, harbors, and roads shall be equally extended to all the belligerents, so long as they respect our neutrality." (Crocker, Extent of the Marginal Sea (1919 ed.), pp. 595–596)

The above statute, resolution and proclamation comprise the only claims of the nation of Hawaii to the channels between the islands,[10] and the records of the Hawaiian nation disclose no other manifestation of any claim to the channels between the islands for the next 44 years, i. e., until annexation. During that period however, there is strong

---

ground, the Luhee ground, the Malolo ground, together with the ocean beyond." (Note: No precise locations or dimensions are stated.) Fundamental Laws of Hawaii, 1842. ("Kilohee" and "Luhee" grounds: the deep sea and shallow sea squid fishing grounds; "Malolo": flying fish.)

10. Island and State have both insisted that because the word "channels" appears several times in the laws of the Kingdom in connection with the public property of the Kingdom of Hawaii, the enactment and continuing effect of such laws maintained the nation's claim to the interisland channels. This theory is without substance. The rule of *pari materia* was written right into the laws of 1859. Chapter III, § 11 (Compiled Laws 1884): "Laws in *pari materia*, or upon the same subject matter, must be construed with reference to each other;" and even before it was so codified, the doctrine had been inculcated into the law of the Kingdom by Chief Justice Lee in 1847 in the case of Shillaber v. Waldo, 1 Haw. 31 (21).

Chapter VII (Compiled Laws 1884, p. 9) or the laws of 1859 concerns itself with the Department of the Interior and with the powers and duties of the Minister of that Department. Article I of that Chapter (Id., at 10) is headed: "Of The Government Lands and Other Property", and § 40 thereunder provides: "The said Minister shall be accountable for the preservation and safe keeping of the government property, and it shall be his duty to prosecute any person injuring, trespassing upon, or wrongfully taking the same, such as land, timber, streams, ponds, springs, water-courses, reservoirs, waterworks, reefs, harbors, channels, wharves, lights, buoys, beacons, highways, bridges, markets, buildings, vessels, and other government property of whatsoever kind or nature."

§ 189 of Article IV (Id., at 45) headed: "Of Harbors, Channels, Buoys, Beacons, Wharves and Water Works", goes on to provide: "It shall be the duty of the Minister of the Interior to superintend all harbor improvements; the demarkation and improvement of channels: the erection of all public lights and beacons; and the construction and repair of all public wharves and piers throughout the kingdom."

The plain wording of the above sections illustrates that the channels referred to are those involved in port entries.

evidence that Hawaii's claim had been considered an empty gesture, or entirely abandoned.

In 1849, in The King v. Parish, 1 Haw. 58 (36), in determining whether or not the Hawaiian courts had criminal jurisdiction over some deserting seamen who had stolen a whaleboat, etc., from an American whaler lying in the roadstead of Lahaina (and thus in the Auau Channel between Maui and Lanai—see Ex. C), i. e., when faced with the question of whether the offense was committed upon the high seas or within the territory of the Kingdom, Chief Justice Lee construed "Ch. 2, Art. 2, Sec. 1, of the Act to organize the Judiciary Department" which gave to the Police Justices of Lahaina and Honolulu, 'original jurisdiction of torts and wrongs arising upon the high seas, and the waters within His Majesty's maritime jurisdiction' * * *," as limiting that jurisdiction to "torts and wrongs arising upon the high seas when committed on board of Hawaiian vessels." Id., at 59–60. This being an American ship, and within three miles of Lahaina, Chief Justice Lee found that it had occurred within Hawaiian territory because "it was the unshaken doctrine of the law of nations, that the maritime territory of every state extends to the ports, harbors, bays * * * adjacent parts of the sea enclosed by headlands, belonging to the same state. The general usage of nations superadds to this extent of territorial jurisdiction a distance of a marine league, * * * along all the coasts of the state. Within these limits its rights of property and territorial jurisdiction are absolute and exclude those of every other nation. That the legislature of this Kingdom in claiming a jurisdiction over the seas surrounding our coasts to the distance of one marine league, had done no more than simply declare the universal law of nations." Id., at 60–61.

It should be noted that if Chief Justice Lee, who was also a member of the Privy Council then, as well as when it passed its Resolution of 1850 (supra, p. 12),

had given any weight to the claim set forth by §§ II and III of the 1846 Act (supra, p. 12) which purported to make the channels an internal part of the Kingdom to the point that any ship entering the same was entering "His Majesty's waters", and over which the King claimed "civil and criminal jurisdiction," it would have been unnecessary for him to have found jurisdiction solely from the fact that the ship was within three miles of shore.

By § 1491 of the Civil Code of 1859, the Second Act of Kamehameha III, (supra, p. 12), was expressly repealed.

The Kingdom's Neutrality Proclamation of 1877, again involving the waters in and around Hawaii, set forth:

"Now, therefore, we, Kalakaua, by the grace of God, King of the Hawaiian Islands, do hereby declare and proclaim the neutrality of this Kingdom, its subjects, and of all persons within its territory and jurisdiction, in the war now existing or impending between the Great Powers of Europe; that the neutrality is to be respected by all belligerents to the full extent of our jurisdiction including not less than one marine league from the low-water mark on the respective coasts of the islands composing this Kingdom, and also all its ports, harbors, bays, gulfs, estuaries, and arms of the sea cut off by lines drawn from one headland to another; and that all captures and seizures, enlistments, or other acts in violation of our neutrality within our jurisdiction are unlawful." (Crocker, Extent of the Marginal Sea (1919 ed.), p. 596)

By this proclamation, Kalakaua apparently contented himself with claiming jurisdiction over the waters within one marine league (3-mile limit) of the low-water mark of the respective island's sea shores.

The resolution of the Privy Council of 1850 (supra, p. 12) came up for specific consideration in Ter. of Hawaii v. Liliu-

okalani, 14 Haw. 88, 91–92, and on March 11, 1902, the Supreme Court of the Territory ruled that the "privy council had no power to enact laws. The only power they had at the time of the passage of this resolution was to advise with the king. * * * The legislative power was in the house of nobles and house of representatives, and only by their combined action and assent could laws be passed. We find no power given by any statute empowering the privy council to enact laws."

If the claim of jurisdiction to all channels, as set forth in the Second Act of Kamehameha III, supra, be given its full thrust,[11] it must be construed as a claim that the channels between the respective islands were closed channels, a part of the inland waters of the Kingdom, into which any ship would be sailing when it entered upon the waters of the channels, that any transportation across the same would be exclusively under the control of the Kingdom, and over which the Kingdom would exercise full civil and criminal jurisdiction.

Not only is it obvious from the wording of the acts, resolutions, proclamations and decisions of its court[12] that Hawaii was fully cognizant of the problems of shore and sea boundaries, but history shows that Hawaii, a small and weak nation, was involved in an international tug-of-war between France, Great Britain and the United States from 1839 until it was finally annexed by the United States. The problems of freedom of the seas and claims to exclusive jurisdiction over territorial waters were as much an international problem then as they are today. The wording of the acts, resolutions, proclamations and decisions shows that the King's advisers and lawyers well understood the complexities of the international laws of the sea.

The detailed analysis of the status of "Hawaii's historical claim" to the channels is necessitated by the Joint Resolution of the United States Congress of 1898 providing for annexing the Hawaiian Islands to the United States whereby the United States acquired every right and claim of the nation of Hawaii.[13]

11. We have no problem here of mistranslation. The Act of 1864, amending § 1493 of the Civil Code of 1859, providing for the construction of statutes where the English and Hawaiian versions do not agree, states: "Whenever there shall be found to exist any radical and irreconcilable difference between the English and Hawaiian version of any of the laws of the Kingdom, which *have been,* or may hereafter be enacted, the English version shall be held binding." (Emphasis added.) Compiled Laws 1884, pp. 490–491.

12. See The King v. Parish, supra; Fessenden v. Cargo of Ship Charles, 1 Haw. 161 (94) 1853; Spencer v. Bailey and Gilbert, 1 Haw. 187 (108) 1853.

13. (a) The Resolution of September 9, 1897 of the Senate of Hawaii Ratifying the Treaty of Annexation of June 16, 1897 (R.L.H.1955, Vol. I, p. 15):
"Article I [of the Treaty]. The Republic of Hawaii hereby cedes absolutely * * * to the United States of America all rights of sovereignty of whatsoever kind in and over the Hawaiian Islands * * *.
"Article II. The Republic of Hawaii also cedes and hereby transfers to the

United States the absolute fee and ownership of all public * * * lands, public buildings * * * ports, harbors * * * and all other public property of every kind and description belonging to the government of the Hawaiian Islands, together with every right and appurtenance thereunto appertaining."
(b) Joint Resolution No. 55 of the United States Congress of July 7, 1898 (R.L.H.1955, Vol. I, p. 13):
"*Resolved* * * * That said cession [note 13a supra] is accepted * * * and the said Hawaiian Islands * * * are hereby, annexed as a part of the territory of the United States and are subject to the sovereign dominion thereof, and that all and singular the property and rights hereinbefore mentioned are vested in the United States of America."
(c) In comparing the proposed treaty of annexation of 1854 between Kamehameha III and the United States, it is noted that at that time the Kingdom would have ceded (Article I) "all public lots and squares, Government lands * * * salt lakes and springs, fish ponds, public edifices * * * forts, ports, and har-

The Hawaiian Organic Act of April 30, 1900, supra (31 Stat. 141, c. 339) providing a government for the Territory of Hawaii states:

"Chapter I * * * § 2. Territory of Hawaii. That the islands acquired by the United States of America [under the Joint Resolution, supra] * * * shall be known as the Territory of Hawaii." (At p. 17, R.L.H.1955.)

Chapter III, § 73 (p. 30 R.L.H.1955) of the Organic Act gave to the Territory as public lands, "all lands in the Territory of Hawaii classed as government or crown lands previous to August 15, 1895," with certain exceptions. Chapter VI, § 89, (p. 40, R.L.H.1955) placed all wharves and landings of the Republic under the control of the Territory. § 91 (p. 41, R.L.H.1955) gave to the Territory of Hawaii the possession, use and control of all public property (with certain exceptions) ceded to the United States "until otherwise provided for by Congress."[14] § 96 (p. 42, R.L.H.1955) provides for claims of private rights to fisheries. § 97 (p. 42, R.L.H.1955) provides that "[t]he health laws of the government of Hawaii relating to the harbor of Honolulu and other harbors and inlets from the sea * * * shall remain in the jurisdiction of the government of the Territory of Hawaii * *." § 98 (p. 42, R.L.H.1955) provides that the "coasting trade between the islands aforesaid and any other portion of the United States, shall be regulated in accordance with the provisions of law applicable to such trade between any two great coasting districts." § 106 (p. 43, R.L.H.1955) gave to "[t]he board of harbor commissioners of the Territory of Hawaii * * * all the powers * * * which may lawfully be exercised by * * * the Territory of Hawaii relative to the control and management of the shores, shore waters, navigable streams, harbors, [etc.] * * and the shipping using the same * *."

It must be noted that nowhere in the Organic Act does the Territory of Hawaii gain anything more than control over the islands and their shores. The channels are unmentioned.

The channels between the islands remained unclaimed until the Constitutional Convention of the State of Hawaii in 1951.[15] The Constitutional Convention Standing Committee by its Report 56, p. 259, stated:

"The words 'territorial waters' are meant to include those rightful areas as incurred in the Hawaiian Organic Act * * * which includes not only the three-mile limit but the territorial waters between the named islands."

At the 1953–54 hearings before the Committee on Interior and Insular Affairs of the United States Senate, 83rd Congress, on S. 49, S. 51 and H.R. 3575 (all bills providing for statehood for Hawaii), the Hon. Joseph R. Farrington, Delegate in Congress from the Territory of Hawaii; the Hon. C. Nils Tavares, chairman of the Hawaii Statehood Commission, former Attorney General of the Territory of Hawaii (and now United

bors, reefs, docks," etc. (There is no mention of channels.) Papers Relating to the Annexation of the Hawaiian Islands to the United States, 52nd Congress, 2d Session, Senate, Ex.Doc. No. 76, 1893, p. 123.

14. In Territory of Hawaii v. Kerr, 16 Haw. 363 (1905) the Supreme Court of Hawaii held that that portion of the shore which is between high and low water marks was owned by the United States. The Territory was but the manager of it.

15. Defendant has urged that the Supreme Court of Hawaii in Bishop v. Mahiko, 35 Haw. 608, 641–645 (1940), affirmed Hawaii's claim to the island channels. All that the Court did was to quote the Second Act of Kamehameha III and the Resolution of the Privy Council. Thereafter, the Court *decided* only that "title to the shores of the islands composing the Hawaiian Islands passed, upon the adoption of the Newlands Resolution [Joint Resolution No. 55, supra note 12], to the United States and thereupon became the sole property of the United States, subject to vested rights."

States District Judge for the District of Hawaii) ; and the Hon. Oren E. Long, former Governor of the Territory of Hawaii, later a United States Senator, and then a member of the Statehood Commission—all three jointly and severally stated positively and unequivocally that Hawaii made no claim for control of ocean waters beyond the traditional three-mile limit. (Hearings, supra, Part 2, pp. 40–4, 47–8, 51–2, 121–4, 132, 265.)

Although during that session there was much discussion and some confusion concerning the "historical claim" of Hawaii to the interisland channel waters, when the Hawaiian Statehood bills came up before the 84th Congress (Hearings of 1956), H.R. No. 88 on H.R 2535, the Committee on Interior and Insular Affairs reported that the boundaries of the new State of Hawaii were to include all the islands that formed the Hawaiian archipelago, together with the "territorial waters appurtenant to such islands" and defined 'territorial waters' as "all inland waters, all waters between the line of mean high tide and the line of ordinary low water, and all waters seaward to a line three geographical miles distant from the coast line * * *."

The preceding historical analysis of Hawaii's claims to its territorial waters and its interisland channels brings us to 1959, S.B. 50, and Statehood for Hawaii. For the moment, this court will not concern itself with what the various departments and bureaus of the federal government advised Congress concerning the boundaries of Hawaii, in connection with S.B. 50, but will attempt to determine the legal basis, if any, Hawaii had in 1959 to maintain that the term "territorial waters" as used in the Statehood Act, included the interisland channels.

The determination of the meaning of the term "territorial waters" forces this court to turn to the National and international interpretation of the term. The criteria which governed the delimitation of the territorial waters of the United

States was clearly set forth in letters from the Department of State to the Department of Justice on the subject of territorial waters: "November 13, 1951. Reference is made to your [Department of Justice] letter dated October 30, 1951, requesting a statement from the Department of State in regard to the position of the United States * * *:

* * * * * *

"(e) With respect to the measurement of territorial waters when * * * islands or groups of islands lie off the coast, the United States took the position at the Conference [Conference for the Codification of International Law held at The Hague in 1930] that * * * each island * * * was to be surrounded by its own belt of territorial waters measured [from the low water mark along the coast, seaward for a distance of one marine league, or three nautical miles] * * *.

"(f) * * * [W]ith respect to a strait, whether it be a strait between the mainland and offshore islands or between two mainlands * * * the United States took the position * * * that if a strait connected two seas having the character of high seas, and both entrances did not exceed six nautical miles in width, all of the waters of the strait should be considered territorial waters of the coastal state. In the case of openings wider than six miles, the belt of territorial waters should be measured in the ordinary way [see (e) supra] * * *. [T]he waters of a strait were not to be regarded as inland waters, even if both belts of territorial waters and both shores belonged to the same state * * *. With respect to a strait which is merely a channel of communication to an inland sea, * * * the rules regarding bays should be applied [i. e., if the bays were no more than ten miles wide, the base line of territorial waters is a straight line drawn across the

opening, where the opening exceeds ten miles in width, at the first point therein where the width does not exceed ten miles]." [16]

"February 12, 1952. Reference is made to your [Department of Justice] letter of January 22, 1952, inquiring whether, in the light of the decision of the International Court of Justice in the Fisheries Case (United Kingdom v. Norway) in date of December 18, 1951 * * *.

"The Department noted the holding of the Court that the Norwegian Government in fixing the base lines for the delimitation of Norwegian fisheries by applying the straight base lines method had not violated international law, especially in view of the peculiar geography of the Norwegian coast and of the consolidation of this method by a constant and sufficiently long practice." [17]

The term "territorial waters" is normally used to describe both water areas that comprise the inland waters and the territorial sea. Inland or internal waters include all bodies of water within the land territory and true bays, as well as the area between high-water mark and low-water mark. The common legal feature of all inland waters is the complete sovereignty which a nation exercises over them, i. e., the same as it exercises over its land territory. The sovereignty includes the right of exclusion of foreign vessels

Seaward of the inland waters is the marginal sea, also called the territorial sea and the 3-mile limit. This forms part of the marginal territory of the coastal nation, but foreign merchantmen and perhaps foreign warships in time of peace, have the right of innocent passage through them. The enjoyment of this right may be subject to special regulations laid down by the coastal state for the protection of navigation and for the execution of laws relating to customs, quarantine, etc. This privilege, nevertheless, leaves the general principle of sovereignty intact, and within the 3-mile limits the jurisdiction of the coastal state is as exclusive as its jurisdiction over the land itself. Seaward of the territorial waters lie the high seas, i. e., the open sea (but in the context of the Submerged Land Cases, infra, "open sea" refers to all the water areas seaward of the *inland* waters). [18]

As indicated above, Kamehameha III's Act of 1846 can only be construed as a claim that the interisland channels were closed, i. e., inland, waters of the Kingdom. The neutrality proclamation of 1854 purported to implement this claim that they were internal waters by declaring all seizures made within the channels an invasion of the jurisdiction of the Kingdom, and unlawful.

The only way in which the extent of such internal waters could be measured would be that which was urged by Island in oral argument, i. e., by virtue of straight base lines running from headlands on each side of the channel. For example, the Kauai channel would be bounded on the east by Kauai's Kahala Point and Oahu's Kahuku Point, and on the west by Kauai's Makahuena Point and Oahu's Barbers Point. The Molokai Channel would presumably be bounded on the east by Oahu's Mokapu Point and Molokai's Ilio Point, and on the west by Oahu's Koko Head and Molokai's Laau Point. The breadth of Alenuihaha Channel would be fantastic: its boundaries on the east being Maui's Kauiki Head and Hawaii's Halaula, and on the

---

16. See Shalowitz, Shore and Sea Boundaries, Vol. I, Append D, pp. 354–356.

17. Shalowitz, supra note 16 at 357.

18. Shalowitz, supra note 16, pp. 22 et seq. See also testimony of R. T. Yingling, Asst. Legal Adviser in the U. S. Dept. of State, U. S. delegate to the 1958, 1960 Geneva Conferences on the Law of the Sea, Tr. pp. 140–146; Report of the International Law Commission to the General Assembly of the United Nations, 1956, Yearbook of the International Law Commission 1956, Vol. II, commentary to the Articles of the Law of the Sea, Part I, Territorial Sea, p. 265.

west by Kahoolawe's Kaka Point and Hawaii's Keahole Point. (See Ex. C)[19]

The above areas then are the "historic waters" which certainly Island, and impliedly State, claim as the historic waters of Hawaii.

It is instantly apparent that any such delimitation of the boundaries of Hawaii would in effect expropriate to Hawaii large areas of water, normally falling within the international concept of high seas, thus cutting down the sea area over which the doctrine of "freedom of the high seas" could apply.[20] "This country, throughout its existence has stood for freedom of the seas, a principle whose breach has precipitated war among nations. The country's adoption of the three-mile belt is by no means incompatible with its traditional insistence upon freedom of the sea, at least so long as the national Government's power to exercise control consistently with whatever international undertakings or commitments it may see fit to assume in the national interest is unencumbered."[21]

The "historic waters" concept constitutes an exception to the general rules of international law governing the delimitation of the maritime domain of a state.[22] Therefore, the title to "historic waters" is generally considered in the nature of a prescriptive right, i. e., by virtue of "acquisitive prescription".

The position of the United Kingdom in the Norwegian Fisheries case, United Kingdom v. Norway, was that a state can only establish title to areas of sea which do not come within the general rules of territorial or inland waters, on the basis of a prescriptive title.[23] Norway's position in the same case was "the usage on which an historic title is based must be peaceful and continuous, and consequently * * * the reaction of foreign States constitutes an element to be taken into account in an appreciation of such title * * *."[24]

■■ At least three factors must be taken into consideration in determining whether a state has acquired an historic title to a maritime area. These factors are 1, the exercise of authority over the area by the state claiming the historic right; 2, a continuity of this exercise of authority; and 3, the attitude of foreign states. The authority which a state must continuously exercise over a maritime area in order to be able to claim it validly as "historic waters" is sovereignty, i. e., it must be claimed as a part of its national domain. Absent international approval of the claim, the activities carried on by the state in the area in question must be something far more objective than simply and solely internal verbalization, i. e., local legislation or proclamation: 1. The sov-

19. Island argued that straight base lines should run completely around the eastern perimeter of the Hawaiian archipelago from island headland to island headland and on the western perimeter should run straight from Niihau's Kawaihoa Point to Hawaii's Ka Lae, thus including within its boundaries all of the open ocean between "the cord of the bow and the bow itself," but not even Kamehameha III ever made any such grandiose claim, and a similar type of claim put forth by California was rejected in United States v. California, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947), (as this court has said before).

20. "Definition of the high seas, Article 26.
  "1. The term 'high seas' means all parts of the sea that are not included in the territorial sea * * * or in waters of a State.

"2. Waters within the baseline of the territorial sea are considered 'internal waters'."
(Report of the International Law Commission to the General Assembly of the United Nations, Document A/3159, Yearbook of the International Law Commission 1956, Vol. II, p. 259.)

21. United States v. California, supra note 19, 332 U.S. at p. 35, 67 S.Ct. 1658, at p. 1666, 91 L.Ed. 1889.

22. United Nations Secretariat, Memorandum on "Historic Bays", (A/Conf. 13/1, p. 18–20).

23. International Court of Justice, Pleadings, Oral Arguments, Documents, Fisheries Case, Vol. II, p. 302.

24. Ibid., Vol. III, pp. 461–462.

ereignty claimed must be effectively exercised; the intent of the state must be expressed by deed and not merely by proclamations, e. g., keeping foreign ships or foreign fishermen away from the area, or taking action against them. 2. The *acts* must have notoriety which is normal for acts of the state.[25]

■ · Continuous usage of long standing of the maritime area was demanded even in 1894 (Institute of International Law of 1894). Established usage generally recognized by the nations, was the criteria set up by the International Law Association of 1926. Since an historic title to a maritime area must be based on the active exercise of sovereignty over the area by the state claiming it, the activities from which the required usage must emerge was consequently a repeated or continued activity of that same state. Passage of time is therefore essential; i. e., the state must have kept up its exercise of sovereignty over the area for a considerable time.[26]

In the Fisheries Case, supra, Norway claimed that certain areas off the Norwegian coast (one of them demanding a "baseline" boundary running over the open sea for a distance of 100 miles) were reserved for the exclusive fishing of her nationals. The United Kingdom claimed those areas were "high seas". The historic pattern of exercise of sovereignty showed that prior to the 17th Century there had been disputes between British and Norwegian fishermen in the areas, and as a result of Norway's complaints, the British did not fish in those areas for 300 years. Beginning in 1906, however, British vessels again appeared, with resulting frequent "incidents" and much intergovernmental action, with British trawlers being ar-

rested and condemned by Norway. The International Court of Justice found that the same were "historic waters" of Norway.[27]

■ The burden of proving the open and notorious use of the area in question rests on the state claiming that its "historical waters" possess a character inconsistent with the principle of the freedom of the high seas. Since the historic element is the basis for validating what is an exception to the general rule of freedom of the seas and therefore intrinsically invalid, the burden of proof is thus logically and emphatically placed upon the claimant state.[28]

When the claim of the Kingdom of Hawaii is measured in the light of the above rules of international law, it instantly becomes obvious that the nation of Hawaii ceded and turned over to the United States no valid claim of sovereignty over the interisland channels.

As indicated heretofore, the first and only steps to set up the interisland channels as historic waters were manifested in the years 1846 to 1854, i. e., the Acts, Resolutions and Proclamations, supra. There was, however, never any external manifestation of the verbal claim of sovereignty over the channels. Actually, the Kingdom had no means of enforcing any such claim as set forth in the Neutrality Proclamation of 1854: During its entire history, the Kingdom had only one warship, the SS Kaimiloa, an ex-steamer of 170 tons, refitted into a "man-of-war", which, in 1877, made but one inglorious and disastrous voyage—to Samoa.[29] Further, Kalakaua's 1877 Proclamation of Neutrality negated Kamehameha III's claims of sovereignty over the waters.[30]

25. *"Juridicial régime of historic waters, including historic bays"* prepared by the Secretariat, United Nations, Yearbook of the International Law Commission 1962, Vol. II, pp. 13–15.

26. Ibid., p. 15.

27. International Court of Justice Yearbook 1951–52, p. 78.

28. Supra note 23, Vol. I, p. 566; Vol. II, pp. 645–646.

29. Alexander, History of the Later Years of the Hawaiian Monarchy and Revolution of 1893, (1896) pp. 17–19.

30. Cf. Supreme Court's comments on Texas' claims to the submerged lands for three leagues from shore in United States

■ As indicated above, upon annexation the United States was ceded all rights of the nation of Hawaii. That nation's claim of jurisdiction over the interisland channels had never ripened into a prescriptive historical right to the waters. Thereafter, the United States never made any claim, either locally, nationally, or internationally, that the channel waters were being claimed by the United States as "historical waters", i. e., internal waters of Hawaii.

To the contrary, consistent with its international policy of freedom of the seas and the three-mile limit of territorial waters,[31] in all of the hearings before Congress, the various departments of the government insisted that the channel waters, beyond the three-mile limit, were "high seas". Before the Subcommittee on Territories and Insular Affairs of the 86th Congress, 1st Session, 1959, then considering the Hawaii Statehood bill, S. 50, Mr. Franklin M. Stone, General Counsel of the CAB, stated:

"To the extent that the channels and waters between the islands comprising the land area of the State of Hawaii are not defined or considered to be a part of the State of Hawaii, the Board would also continue to exercise regulatory jurisdiction over air transportation between the islands by virtue of the definition of interstate air transportation, since the carrier would be traveling between points within the same State, but through the airspace outside thereof."

At the same time and occasion, Mr. Ted Stevens, Assistant to the Secretary of the Interior, in a statement to Senator Henry M. Jackson of Washington, clearly indicated that the term "territorial waters" within the provision of the Statehood Act was to include "all waters seaward to a line 3 geographical miles distant from the coastline," i. e., the line of ordinary low water along the coast, and as stated in the Committee report which accompanied the Statehood bill:

"Hawaii presents a unique situation with respect to the impact of statehood on the Federal regulation of air transportation between the main islands. *This is because of the geographical structure of the Territory, the land areas being separated by substantial expanses of ocean which are not included in the territorial limits of Hawaii.*

S.Rept. 80 (to Accompany S. 50), 86th Cong., 1st Sess., (Emphasis supplied.)"

■ As our Supreme Court said in United States v. Louisiana, 363 U.S. 1, 35, 80 S.Ct. 961, 981, 4 L.Ed.2d 1025 (1960):

"The power to admit new States resides in Congress. The President, on the other hand, is the constitutional representative of the United States in its dealings with foreign nations. From the former springs the power to establish state boundaries; from the latter comes the

---

v. Louisiana, 363 U.S. 1, 60–61, 80 S.Ct. 961, 994, 4 L.Ed.2d 1025 (1960): "More important for the purposes of this case are the circumstances that the three-league provision was made an express part of the Treaty of Guadalupe-Hidalgo, that such boundary was reaffirmed five years later in the Gadsden Treaty of December 30, 1853 and subsequently in a long line of international conventions, and that it has never been repudiated." (Footnotes omitted.)

31. United States v. California, 332 U.S. 19, 33–35, 67 S.Ct. 1658, 1666, 91 L.Ed.

1889 (1947): "That the political agencies of this nation both claim and exercise broad dominion and control over our three-mile marginal belt is now a settled fact. * * * And this assertion of national dominion over the three-mile belt is binding upon this Court. * * *

"Not only has acquisition, as it were, of the three-mile belt, been accomplished by the national Government, but protection and control of it has been and is a function of national external sovereignty. * * * This country, throughout its existence has stood for freedom of the seas, * * *." (Supra p. 1004)

power to determine how far this country will claim territorial rights in the marginal sea as against other nations. Any such determination is, of course, binding on the States. * * * [T]here is no question of Congress' power to fix state land and water boundaries as a domestic matter. Such a boundary, fully effective as between Nation and State, undoubtedly circumscribes the extent of navigable *inland* waters and underlying lands owned by the State under the Pollard rule." (Pollard's Lessee v. Hagan, (44 U.S. 212) 3 How. 212, 11 L.Ed. 565.)

A study of the above case and other authorities [32] clearly shows that the term "territorial waters" has a uniformly well understood meaning and application, viz., the term includes 1, the water area comprising both inland waters (rivers, lakes and true bays, etc.) and 2, the waters extending seaward three nautical miles from the coast line, i. e., the line of ordinary low water, (offtime called the "territorial sea"). Seaward of that three-mile territorial sea lie the high seas. The Submerged Lands Act (1953) confirms titles to the States in the submerged lands off their coasts for a distance of three geographical miles from the coast line. Section 5(i) of the Hawaii Statehood Act reads:

"The Submerged Lands Act of 1953 * * * and the Outer Continental Shelf Lands Act of 1953 * * * shall be applicable to the State of Hawaii, and the said State

shall have the same rights as do existing States thereunder." [33]

Thus, when Congress granted statehood to Hawaii, it said:

"The State of Hawaii shall consist of all the islands together with their appurtenant reefs and territorial waters, included in the Territory of Hawaii on the date of the enactment of this Act * * *." [34]

And thereby the boundaries of Hawaii were fixed at three nautical miles from the line of ordinary low water surrounding each and every one of the islands composing the State of Hawaii. Beyond that "3-mile" boundary line around each island lie the high seas which roll unchecked through the channels between the islands. Neither those intervening seas nor the floors thereof are within the boundaries of Hawaii.

■ The above finding gives to Hawaii jurisdiction over the surrounding ocean waters no greater nor less than that given to every other state of the Union bordering upon the sea. Neither the Hawaii State Admissions Act [35] nor this decision takes away any internal rights of Hawaii to control its intrastate commerce. The CAB would have no control over purely intrastate flights between Hilo, Kona and Kamuela on the Island of Hawaii, or between Kaanapali, Kahului and Hana on the Island of Maui. Congress recognized that Hawaii was unique in that it was a state composed entirely of islands. If Congress had wanted to leave to the State complete control over interisland passage by

32. See also Shalowitz, supra note 16, pp. 22–24.

33. See United States v. California, 332 U.S. 804, 68 S.Ct. 20, 92 L.Ed. 382; Submerged Lands Act (67 Stat. 29) 1953; Department of State Bulletin of June 29, 1959, Publication 6879, Measurement of the United States Territorial Sea.
See also, Shore and Sea Boundaries, supra note 16, p. 228, note 46: "When Hawaii was admitted as a state, its sea boundaries did not include all the water areas between the islands but

only a 3-mile belt around each island, leaving areas of high seas between most of them. S.Rept. 80, 86th Cong., 1st Sess. 4 (1959)."
See, e. g., G. Etzel Pearcy, Hawaii's Territorial Sea, 11 The Professional Geographer, No. 6, Nov. 1959, in which the author in describing the territorial seas of the State of Hawaii assumes a three-mile belt of territorial waters for each island.

34. Hawaii State Admissions Act, supra note 3.

35. Supra note 3.

sea or air, it could have done so. Nevertheless, that Congress chose *not* to so provide—even in the face of the statements of Mr. Ted Stevens and Senator Jackson on this specific problem (supra p. 1006) —did not thereby demote "unique Hawaii" into a second-class state, nor did it put Hawaii upon a different footing than that of all other states of the Union insofar as its control over interisland, overseas flights was curtailed. Its curtailment is simply a matter of degree, not of substance.[36]

Apart from the above finding, every time a flight is made by Island over the Federal airways between Oahu and Kauai, Island must fly over the high seas many sea leagues from either shore.

The heavy air traffic around the Honolulu airport definitely prevents "direct" flights between the Honolulu Airport and Kauai, and on Kauai-Oahu flights, all planes must fly in the Federal airways on an east-west course—V2, VI2, VI5 (Exhibit 1)—to the places marked "Breakers" or "Orchid", respectively, some 25 and 40 nautical miles west of the nearest place on Oahu, and some 50 nautical miles southwest from Kauai, places which are clearly outside of any rational boundary claims of the State of Hawaii and over the high seas.

Further, when flying between Honolulu, Maui, and Hawaii, as shown on Exhibit 1, upon the often-necessary flights made under instrument flight rules (I.F.R.), as shown on Exhibits A1, A2, A3, and A4, Island has [37] and *must* fly on airway V6 to "Sweet Pea", which is over 9 nautical miles north of Maui, and over "Halibut", which is over 20 nautical miles northeast of Maui, and over 45 nautical miles from Hawaii, or on airway V15 to "Rainbow", which is over 25 nautical miles east of Maui and over 35 nautical miles north of Hawaii, all of which places are over the wide open Pacific and admitted by Island to be far beyond any boundaries that could possibly be claimed for the State of Hawaii.[38]

◼ Unquestionably then, whether Island flies over the channels or outside of them, it is compelled to fly its passengers over places outside the State's boundaries in order to fulfill its obligations as an air carrier between the islands. It therefore follows that Island's scheduled interisland flights carrying persons or property are in interstate air commerce between a place in Hawaii to another place in Hawaii, through airspace over places outside thereof, within the scope of the definition of interstate air transportation in the Act (49 U.S.C.A. § 1301(21) (a)), and the CAB has jurisdiction and control over the flights of any such air carrier (and Island is such an air carrier). Such a carrier may not, therefore, carry on such flights between the islands making up the State of Hawaii without having first received a Federal certificate from the CAB under

36. Cf. Lord v. Steamship Co., supra; Wilmington Catalina Air v. Grandfather Certificate, supra; United Air Lines, Inc. v. Public Utilities Commission of Cal., supra.

37. It has been stipulated that Island, during the month of June 1963 on scheduled flights carrying passengers for hire as a common carrier between the Islands, opperating on Federal airways V6, V13, and V12, passed over the Sweet Pea, Halibut, Rainbow, Paradise, Orchid, and Breakers intersections.

38. Island offered testimony to show that the Federal airways shown on Exhibit 1 were subject to change and that Island could apply for and might secure

from the Federal Aviation Agency (FAA) different airways, all of which would fly directly over the "channels" and thus conceivably be determined that those completely undefined channel areas between the islands are within the boundaries of the State of Hawaii.

The evidence also showed that any such changes in Federal airways are not simple procedures; that it took a minimum of six months to set up any new airway system and the FAA has the option of adopting or rejecting any such application after submission to the total users.

This court places no weight, therefore, upon Island's claim that it can bring about the creation of any such new Federal airways.

Section 401 of the Act (49 U.S.C.A. § 1371).

■ Having found that Island is flying in interstate air commerce within the scope of the Act, this court must then necessarily determine if its interisland flights, even though clearly in interstate air commerce, are of purely local interest and concern, i. e., that as a practical matter such interisland air transportation is of far greater concern to the State of Hawaii than to any interests of the United States in regulating air transportation under the Act. Cf. Bob Lo-Excursion Co. v. Michigan, 333 U.S. 28, 68 S.Ct. 358, 92 L.Ed. 455 and Wilmington Transp. Co. v. Railroad Commission of Calif., 236 U.S. 151, 35 S.Ct. 276, 59 L.Ed. 508.

Both Hawaiian and Aloha hold certificates of public convenience and necessity issued by the CAB by which, as interstate air carriers, as defined under the Act, they are entitled to carry persons, property and mail in and about the Hawaiian Islands. Both Hawaiian and Aloha carry thousands of mainland tourists and Hawaiian residents between the islands in interstate commerce by way of through-ticketing.[39] Each has applied for and has been granted subsidy support under Section 406 of the Act, which section enables holders of certificates authorizing the transportation of mail by aircraft to petition the CAB to establish mail rates, and in determining the rate the CAB must consider the need of the air carrier for—

" * * * compensation for the transportation of mail sufficient to insure the performance of such service, and, together with all other revenue of the air carrier, to enable such air carrier under honest, economical, and efficient management, to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the Postal Service, and the national defense."

During the 10-year period ending June 30, 1961, Aloha and Hawaiian have received subsidy payments totaling $3,562,000, and although the CAB estimated aggregate subsidy requirements for the two carriers will be $1,000,000 for the year ending June 30, 1962, and another $1,000,000 for the year ending June 30, 1963, the carriers' claims for subsidy are higher. Neither company is in the best financial shape. (Note: The PUC-approved rates for Island would be 36.5 per cent below the current fares charged by Hawaiian and Aloha.)

In 1959, the CAB guaranteed 90 per cent of the unpaid principal, plus 100 per cent of the unpaid interest on two loans to Aloha for the purchase of F-27 aircraft. The unpaid principal as of August 31, 1962, was $3,525,323. The CAB decision to make the loan guarantee was based in part on current fare levels, two-carrier competition, and the control of the CAB over fare levels and competition in the future.

Without determining what the exact amount of diversion of traffic from Aloha and Hawaiian would be, this court accepts the Government's statement that there would be a very substantial decrease in revenues to the two carriers (estimated at well over $3,000,000 annually). Any substantial loss of revenue would materially increase the claims of the two carriers for subsidy support by CAB, and would also impair the ability of Aloha to repay its CAB guaranteed loans and thus might require payment by the CAB.

It thus clearly appears that the impact of interisland flights by Island, with its low rates, would have a substantial effect upon interstate air commerce, viz., it would apparently necessitate an increased mail subsidy to the two presently certificated carriers, Hawaiian and Aloha, and would put in jeopardy the repayment of Aloha of its CAB-guaranteed loans.

39. The Hawaii Visitors Bureau records show that approximately 132,600 tourists flew between Honolulu and the major islands in 1962.

To deny CAB jurisdiction would substantially interfere with the execution of aims and objectives of the Act and would not be to the best interests of the United States in the regulation of air transportation thereunder. It thus appears that Island's interisland flights are not a matter of purely local interest and concern.

The prayer for a permanent injunction enjoining Island from air transportation of passengers between the islands of Kauai, Oahu, Molokai, Lanai, Maui, and Hawaii, of the State of Hawaii, without first being issued a certificate of public convenience and necessity by the CAB, is granted.

Without passing upon the problem of whether or not this court can take jurisdiction over Island's counterclaim filed herein, in view of the above ruling, this court refuses to assume jurisdiction and the counterclaim will stand dismissed.

A proper order will be signed upon presentation.